731

## NATIONAL LABOR RELATIONS BOARD v. BEAR BRAND HOSIERY CO.

### No. 8060.

Circuit Court of Appeals, Seventh Circuit.

Nov. 27, 1942.

Robert B. Watts, of Washington, D. C., Lester Asher, of Chicago, Ill., Ernest A. Gross, Gerhard P. Van Arkel, Louis Libbin, and Armin Uhler, all of Washington, D. C., for National Labor Relations Board.

David R. Clarke, John Harrington, and Albert J. Smith, all of Chicago, Ill., for respondent.

Before MAJOR and KERNER, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This is a petition for the enforcement of the Board's order issued against respondent, pursuant to the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. Juris-diction is not in dispute, and the usual proceedings were had before the Board.

Inasmuch as respondent questions the validity of only a part of the Board's order, we see no occasion to enter a discussion of the findings, or proof pertaining to parts of the order not under attack. In approaching that portion of the order under attack, it is sufficient to observe that the record discloses a most unfavorable background of hostility toward organized labor, and especially the unions involved. In fact, to state that respondent's course of conduct over a long period of time was inexcusable, is putting it mildly.

The part of the Board's decision now under attack is the finding and conclusion that respondent violated Section 8 (3) of the Act by discrimination in regard to the hire and tenure of employment of John Williams, James Riordan, Lester Sovinski, Willis Donovan and Martin Brueggert, together with ten other employees listed in Appendix A to the Board's order. According to the findings of the Board, the five named employees were discriminatorily discharged on September 17, 1941, and the ten employees named in the appendix went on a strike in protest of the unfair labor practices directed at those named. The latter were ordered reinstated and to be made whole for any loss of pay occasioned by respondent's discrimination. Those named in the appendix were ordered reinstated with back pay from September 30, 1941, the date on which respondent denied their application for reinstatement.

Respondent argues that there is no substantial evidence in support of the Board's finding that the five named employees were discriminatorily discharged, and, there being no discrimination in this respect, the Board's order directing their reinstatement is invalid. It is not disputed but that the order of reinstatement was proper if the five named employees were discriminatorily discharged. Also, in that event, the ten employees named in the appendix had a just grievance for the strike, that is, the unfair labor practice directed at the five named employees, and were entitled to be reinstated upon application.

Thus, the only question for decision is whether the Board's finding as to discriminatory discharge is substantially supported. The employees involved were employed in the power house and had charge of the engines and equipment used in generating power for respondent's factory. The

Board contends that the discharges and the strike were the result of the employees' refusal to sign individual employment contracts proposed by respondent. The essential part of the contract is as follows:

"Whereas, the parties hereto both recognize the fact the neglect or desertion of duty in a Power Plant may jeopardize the lives and bodily safety of men and women and may jeopardize the safety and security of the plant and all its contents:

"It is hereby agreed for the consideration as stated below by the Bear Brand Hosiery Co., which will subsequently be referred to as the Company, as party of the first part, that I, ―― an ―― as party of the second part will not leave my appointed line of duty in the Power Plant without the express approval of my superior, Mr. Erwin Grey, or in his absence the Superintendent of the Kankakee Plant."

The contract was terminable upon thirty days' written notice by either party, and provided a bonus, subject to forfeiture in the event of a breach in the terms of the contract by the employee. At the time this contract was proposed, all but one of the power house employees were members of the union, and an election for the purpose of determining their bargaining agent had been called by the Board.

The Board found that these individual contracts "intrinsically violated the Act, in that they proscribed the employee's right to strike under penalty of discharge." Whether such a finding is proper as an abstract proposition, we need not decide for the reason that we think it is supported under the circumstances of the case. It may be that such a contract would be valid if entered into voluntarily, or, to put it more aptly, as a result of bargaining between an employer and an employee. Such is not this case, however. The proof leaves no room for doubt but that respondent, against the bitter opposition of the employees, engaged in a campaign of coercion and intimidation to force the employees to accept the agreement. On numerous occasions, respondent was advised by individual employees that the contract was inconsistent with membership in the union and that they were opposed to it.

 Respondent's insistence that the employees accept the contract culminated in the events of September 16 and 17. On the former day, Williams, chairman of the union negotiating committee, was called to the office of Henry Pope, Sr., chairman of respondent's board of directors. In response to Pope's inquiries, Williams repeated his reasons for rejecting the contract, but agreed to return to Pope's office on the following day. This he did, in company with Riordan and Sovinski, the other two union representatives of the power house employees. Pope refused to discuss the contract except with Williams alone, and upon the latter's insistence that he discuss it with the committee, Pope terminated the interview with the statement, "You are all out. Get out." That evening, when Williams reported for his regular shift, he discovered that his time card and those of other committee members were missing from their customary place. The committee later in the evening again went to Pope's office, where they were told that they had quit their jobs. This they denied and told Pope that no one had quit.

Respondent, in its answer to the complaint, alleged that these employees had voluntarily quit their employment. It is conceded here, however, that they were discharged, but it is argued that the discharges were not discriminatory but because "of the insolent and insubordinate manner in which they refused to talk to their employer." In our view, there is no merit in such contention. True, Williams refused on one occasion to talk with Pope except in the presence of other members of the union committee. We think his position in this respect was neither insolent nor insubordinate. Pope had knowledge that the three employees represented the union, and we see no reason why he should have refused to talk to the committee about a matter in which the union was vitally interested. The time of the discharges, together with the surrounding facts and circumstances, make it plain that they were the result of refusal on the part of the employees to sign the contract.

 Respondent advances another argument, which requires little more than passing notice. It is premised on the disclosure that some two months prior to the discharges in question, a strike occurred at respondent's plant in which the power house employees participated. It is pointed out that the welfare and safety of the employees of the entire plant were dependent upon the continuous operation of the power house and that this was the sole reason for the proposal of the employment contracts in controversy. Assuming respondent's good faith in this respect, it furnishes no legal

reason for respondent's coercive efforts to compel the acceptance of such contracts by the employees.

The petition of the Board for enforcement is allowed.