NATIONAL LABOR RELATIONS BOARD
v. PORT GIBSON VENEER & BOX CO.
No. 12195.

Circuit Court of Appeals, Fifth Circuit.
April 9, 1948.
Rehearing Denied May 20, 1948.

Ruth Weyand, Acting Asst. Gen. Counsel, David P. Findling, Associate Gen. Counsel, and Fannie M. Boyls, Atty., N. L. R. B., all of Washington, D. C., for petitioner.

Samuel Lang, of New Orleans, La., W. S. Henley, of Jackson, Miss., and R. L. Dent, of Vicksburg, Miss., for respondent.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

This case is here upon petition of the National Labor Relations Board seeking enforcement of an order issued against Port Gibson Veneer and Box Company on August 26, 1946, ordering the Company to cease and desist from certain unfair labor practices, to make whole employees discriminated against, and to post appropriate notices to its employees that their rights under the National Labor Relations Act would not be further violated. 49 Stat. 449, 29 U.S.C.A. § 151 et seq.; Labor Management Relations Act of 1947, Pub.Law No. 101, 80th Cong., 1st Sess., Chap. 120, 29 U.S.C.A. § 141 et seq.

The questions presented are (1) whether there is substantial evidence to support the finding of the Board that the Company has engaged in unfair labor practices within the meaning of Section 8(1) and (3) of the Act; and (2) whether the Board's order is valid and proper.

The Company is a Mississippi corporation residing at Port Gibson, Mississippi, where it is engaged in the manufacture of wooden boxes and containers used to package and ship frozen poultry, fresh fruits,

and vegetables. It is admittedly engaged in commerce within the meaning of the Act.

In August, 1944, the International Woodworkers of America, C. I. O., began organizational efforts among the Company's employees. These employees numbered about 300 persons, about 95% of whom were negroes. In September, 1944, the Union claimed to represent a majority of the employees, and requested the Company to recognize it as the exclusive bargaining representative, and to confer with it at once to formulate a contract covering wages, hours, and working conditions. The Company refused to recognize the Union and contested its majority status. A few days later, Hardy J. Wilson, father of Alex Wilson, President and Manager of the Company, made a speech to the Company employees in which he referred to the unrest in the plant, and warned that organizational efforts then being made by the Negroes would only alienate the white people against them. This speech was made with apparent authority for the Company, as it was generally known among the employees that Mr. Hardy Wilson was the father of the Company President and Manager; that he had been President of the same plant when it had previously operated as the Southern Package Company, and that he still retained control over the allocation of machinery to the Company.

The week following the Union's request for recognition, the Company asked each of its employees to submit to a physical examination and to fill out and sign an application for employment with the Company. This application form had been used before in 1941, when the Company was first organized, but its use was discontinued during the war because of the rapid turnover of personnel and the scarcity of doctors to examine the employees. When it was first used, all of the employees had signed the application without objection, either because it had no significance to them at the time, or because they could not read the applications and did not know the import of the language used. But when they were requested to sign these forms in October, 1944, while their union was trying to organize and seeking recognition with the Company, most of the employees did object, either because they were advised not to sign by their union officials, or because they mistakenly believed that by signing they would contract away their existing rights as employees, and make futile any further attempts by the union to improve their working conditions. They objected mainly to those portions of the application form, Paragraph 14, which provided that "if employment is obtained I agree to assume all the risks and dangers incident thereto," and "the Company shall have the right to dismiss me at any time with or without cause". Later, during the period when the Company was insisting that the employees sign the employment applications and the employees were refusing to do so, it was shown that the Company Superintendent made remarks designed to intimidate and coerce the employees, and to stave off union organization and recognition within the plant. On one occasion this Superintendent approached two employees while they were working and accused one of them of "trying to get a damn union in the plant". When the employee denied the accusation, the Company Engineer joined the group with the remark, "I know these damn Negroes are trying to get their union in". Later, while the employees were holding a union meeting at a church, the Company's plant Manager, Wheeless, parked his car near the church and watched the meeting, while the local sheriff who had accompanied him went to the door of the church where he could watch and hear the proceedings. It was shown that this same sheriff had, on a previous occasion, gone to a local ball park while a union meeting was in progress and had told the union organizer in the presence of the employees, "If I had my way I would run you out of town."

On October 16, 1944, the Company President summoned to his office two employees from each department to ascertain why the majority of the employees still refused to sign the employment application. Not satisfied with the reasons given for their refusal, he issued an ultimatum to all employees that they would have to sign the application by the following Monday morning, October 23rd, if they wanted to continue working at the plant. Accordingly, all em-

ployees who had failed to sign the applications, were met by the foremen at the plant entrance on that date, and refused entrance. Others who had not signed were sent home, and some employees on the afternoon shift who had not signed, learned of the Company's action, and did not report for work. This denial of employment to employees who had refused to sign applications continued for four days, until, on October 26th, the Company President informed the Union's President that the Company would waive the signing of the applications if the employees would return to work. On the following Monday, October 30th, the plant resumed operations with practically a full crew.

On November 22, 1944, the Board conducted an election at the Company plant in which 199 of the employees voted for the Union and only 19 against it, whereupon the Union was certified to the Company by the Board as representing a bona fide majority of the employees, and entitled to recognition as their bargaining representative.

■ We are of opinion the findings of the Board that the Company has engaged in unfair labor practices within the meaning of Section 8(1) and (3) of the Act, as amended, are supported by substantial, and credible evidence. N. L. R. B. v. American Furnace Co., 7 Cir., 158 F.2d 376, 379; N. L. R. B. v. Northwestern Mutual Fire Ass'n 9 Cir., 142 F.2d 866, 867; N. L. R. B. v. Greater New York Broadcasting Corp., 2 Cir., 147 F.2d 337; Ft. Wayne Corrugated Paper Co. v. N. L. R. B., 7 Cir., 111 F.2d 869, 873; Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 230, 231, 59 S.Ct. 206, 83 L.Ed. 126; N. L. R. B. v. Austin Co., 7 Cir., 165 F.2d 592.

■ We further find no merit in the Company's contention that since its employment application was not unlawful, and was admittedly ineffective to preclude future bargaining under the Act, the requirement that the applications be signed could not have interfered with, restrained, or coerced any employees in the exercise of their organizational rights. Employers may not require individual employees to sign employment contracts which, though not un-

lawful in their terms, are used to deter self-organization and forestall collective bargaining. N. L. R. B. v. Superior Tanning Co., 7 Cir., 117 F.2d 881, 890; Cf J. I. Case Co. v. N. L. R. B., 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762; N. L. R. B. v. Grower-Shipper Vegetable Ass'n, 9 Cir., 122 F.2d 368, 377; Western Cartridge Co. v. N. L. R. B., 7 Cir., 134 F.2d 240, 243; N. L. R. B. v. Bear Brand Hosiery Co., 7 Cir., 131 F.2d 731, 732.

■ These employees possessed little education and many of them could not read or write. Under the circumstances, it was reasonable for them to believe the Company intended to use the employment applications as a deterrent to unionization and to preclude the betterment of their working conditions through collective bargaining. Moreover, a sheriff hostile to their proposed union moved among them as was his right. While both the employment applications and the surveillance of the sheriff were in themselves legal, each constituted a threat designed and so timed as to work a formidable hindrance to the union organization, and certainly warranted the finding of the Board.

■ By denying employment during the four day lay-off period to those employees who refused to sign the employment applications, the Company unlawfully discriminated as to hire and tenure of employment, within the meaning of Section 8(3) and (1) of the Act. N. L. R. B. v. Cape County Milling Co., 8 Cir., 140 F.2d 543, 545, 152 A.L.R. 144; N. L. R. B. v. Somerset Shoe Co., 1 Cir., 111 F.2d 681, 689; N. L. R. B. v. National Motor Bearing Co., 9 Cir., 105 F.2d 652, 657, 658.

■ We are of opinion the Company was justified in its refusal to grant reinstatement to the three employees, Anna Brown, Alice Carter, and Pearline Brown, who quit work prematurely on Wednesday, October 18th, in protest of the Company's requirement that they sign the employment application by the following Monday. There existed no unlawful coercion of these employees by the Company prior to October 23, 1944, which could have justified their strike prior to that date. Having walked off their jobs prematurely and vol-

untarily, they thereby lost their status of employees and are consequently not entitled to reinstatement.

With the exception noted, the Board's order is valid and proper, and appropriate for the redress called for by the Act. J. I. Case Co. v. N. L. R. B., 321 U.S. 332, 341, 342, 64 S.Ct. 576, 88 L.Ed. 762; N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 437, 438, 61 S.Ct. 693, 85 L.Ed. 930; N. L. R. B. v. Chency California Lumber Co., 327 U.S. 385, 387, 66 S.Ct. 553, 90 L.Ed. 739.

Let the order of the Board, with the exception noted and the modifications requested, be enforced.