**NATIONAL LABOR RELATIONS BOARD v. BIBB MFG. CO.**

**No. 13102.**

United States Court of Appeals
Fifth Circuit.

April 27, 1951.

Rehearing Denied May 26, 1951.

T. Lowry Whittaker, A. Norman Somers, Asst. Gen. Counsel, National Labor Relations Board, Atlanta, Ga., David P. Findling, Associate Gen. Counsel, Washington, D. C., for petitioner.

C. Baxter Jones, McKibben Lane, Macon, Ga., Frank A. Constangy, Atlanta, Ga., for respondent.

Before HUTCHESON, Chief Judge, and McCORD and BORAH, Circuit Judges.

McCORD, Circuit Judge.

This case is before us on petition of the National Labor Relations Board for enforcement of its order issued against respondent on March 24, 1949, following the usual proceedings under Section 10 of the Act, as amended. National Labor Relations Act, 29 U.S.C.A. § 151 et seq., as amended by the Labor Management Relations Act, 29 U.S.C.A. § 141 et seq.

. The questions presented are whether there is substantial evidence to support the Board's findings that respondent interfered with, restrained, and coerced its employees, in violation of Section 8(1) of the Act: (1) by circulating among its employees an anti-union publication called "The Trumpet"; (2) by having the police department of a town in which one of its plants was situated engage in surveillance of its employees in order to repress their organizational efforts and union activity; (3) by the anti-union activities of two of respondent's alleged supervisory employees; and (4) whether the Board properly found that respondent had violated Section 8(3) of the Act in the alleged discriminatory discharge of four named employees.

Respondent is a Georgia corporation, engaged in the manufacture and sale of cotton and rayon textiles. Its office is situated in Macon, Georgia, and it has four groups of mills located in various counties and towns in the state of Georgia. The alleged unfair labor practices here under consideration occurred at respondent's Porterdale and Macon, Georgia plants.

In the Spring of 1946, Textile Workers Union of America, C. I. O., entered into a campaign to organize some eight or nine thousand employees of respondent's various mill communities. While the organizational drive was in progress, respondent subscribed to and caused to be circulated among its employees a four-page weekly paper, called "The Trumpet", which was an anti-union publication directed particularly to textile mill employees. It dealt almost exclusively with current labor developments, and consistently attacked the organizational activities of the C. I. O. in southern textile mills. Certain issues of the publication threatened employees who favored a union with actual force and violence, and advocated the use of strong-arm methods against union organizers.[1] In some instances it threatened the employees with loss of their employment if they joined the union, and on other occasions promised them increased benefits if the union were rejected.[2]

[1]. For example, in the August 2, 1946, issue of "The Trumpet", employees were warned: "The South will not take it any longer, and it will be a mighty good idea for that gang to decide that we are not going to move one inch. We advise all organizers to close up their affairs, and get on back where they belong, and to those Southerners who have been duped, and hoodwinked by the wild offers of the CIO, money hungry yaps, you better mind what you are doing, for once the Southern people get awake, they get up and do something about it. * * ".

Also, in the October 4, 1946, issue, the union was represented to the employees as a polecat, and violence was advocated against it: " * * if a polecat comes into your house, or on the premises, you are not expected to speak gently, and attempt to persuade mildly the cat to 'leave you alone,' but the thing to do is to call the dogs, get your gun, and enlist the help of the neighbors, so that the little 'respectable animal, * * *' will understand that you *don't want* him hanging around! "

[2]. In the August 16, 1946, issue, the textile laborers were reminded that management had always been their "friend" and were told that the manufacturers "are at this very time prepared—*if the CIO is kept out of the South*—to do more for their labor than they have ever been prepared to do before, and they will do it." A similar statement in the October 18, 1946, issue declared: " * * * there is no doubt at all that the Southern Tex-

It is without dispute that while intense union organizational activity was being attempted within respondent's plants, it increased its subscriptions to the notoriously anti-CIO publication, "The Trumpet", from several hundred copies to over two thousand. It supplied the publisher with the names and addresses of all of its employees, and ordered that weekly copies be mailed to the employees on a rotation basis in order that each employee would receive at least one copy per month. It was the only publication which was made available by respondent to all of its employees.

■ We are of opinion substantial evidence supports the Board's findings that "The Trumpet" contained coercive anti-union statements, and that respondent, by adopting and distributing that publication among its employees for the purpose of defeating their organizational activity[3], thereby violated Section 8(1) of the Act. Cf. N.L.R.B. v. Port Gibson Veneer & Box Co., 5 Cir., 167 F.2d 144, 145; N.L.R.B. v. Gate City Cotton Mills, 5 Cir., 167 F.2d 647, 648; N.L.R.B. v American Furnace Co., 7 Cir., 158 F.2d 376; N.L.R.B. v. Taylor Colquitt Co., 4 Cir., 140 F.2d 92.

■ We are constrained to believe the Board erred in holding the Company responsible for the alleged unlawful surveillance by the police department of Porterdale of the union activities of its employees. Duly appointed public officers, such as members of the police department of a municipality, are presumed to discharge their duties impartially according to law, and this presumption must be overcome by clear and convincing evidence to the contrary. See 20 Amer.Juris. 174.

■ Here, there was no charge of unlawful surveillance by the police except at respondent's Porterdale plants. Moreover, the evidence conclusively reveals that at the time of the alleged violations there was great industrial and political unrest in the Porterdale community. Under such circumstances, neither the Board nor this court is empowered to substitute its judgment for that of the Mayor and Chief of Police of Porterdale, and hold in retrospect that the decision to augment the police force and patrol the community was not necessary for the protection of life and property, both union and non-union, against vandalism and mob violence. Even though respondent may have occupied a dominant economic position in the community, the record in no wise justifies the Board's inference that it was impossible for the town officials to act independently of respondent in the exercise of their proper governmental functions. There is no clear and convincing evidence in the record before us that the alleged unlawful surveillance was directed and controlled by the respondent, or that the police officers acted unlawfully as agents of respondent in the performance of their policing duties. We therefore conclude the Board's findings in this regard are unwarranted and without substantial support or foundation in the record, and the portion of its order based on such findings may not be enforced. Cf. N.L.R.B. v. Port Gibson Veneer & Box Co., 5 Cir., 167 F.2d 144, 145; Cupples Mfg. Co. v. N.L.R.B. 8 Cir., 106 F.2d 100; In re Fentress Coal and Coke Co., 44 N.L.R.B., 1033, 1038.

■ We further find no substantial evidence in the record to support the Board's conclusion that the Company was responsible for the anti-union activities of the non-supervisory employee, Herman Lavender, or the alleged coercive activities of foreman Kite. Cupples Mfg. Co. v. N.L.R.B.,

tile Management will do much better by the workers in the future than they have been able to do heretofore. However, let it be known here and now, that the CIO will have had no part or lot in this improvement."

3. Respondent does not deny that the statements contained in the publication, "The Trumpet", were coercive in nature, but seeks to avoid responsibility for them on the theory that they were made in a paper "of general circulation, not edited by, (or) prepared by" respondent. However, the Board predicated respondent's violation in this regard on the proposition that it had used the publication as an effective instrumentality for defeating self-organization among its employees, and that it was therefore immaterial that the publication was not published or controlled by respondent.

8 Cir., 106 F.2d 100; Jacksonville Paper Co. v. N.L.R.B., 5 Cir., 137 F.2d 148.

With regard to the alleged discriminatory discharges of the employees Tapley, East, Braddy and Cochran, we consider it sufficient to observe that a careful examination of the record evidence as to the discharge of each of these men convinces us that they were discharged for justifiable cause under the Act, and not for their union activities. It therefore follows that the findings and order of the Board to the effect that they are entitled to reinstatement and back pay may not be sustained. N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893; N.L.R.B. v. Riverside Mfg. Co., 5 Cir., 119 F.2d 302; N.L.R.B. v. Fulton Bag & Cotton Mills, 5 Cir., 175 F.2d 675.

The Petition for Enforcement of the Board's order is granted as to paragraphs 1(a) and 1(d),[4] and denied as to paragraphs 1(b), 1(c), 2(a) and 2(b). The order, as modified, is hereby enforced.

Modified and enforced.

4. The portion of the Board's order expressly enforced directs the respondent to cease and desist from:

1(a) "Interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act, by distributing, or causing to be distributed to them, any publication, including The Trumpet, which contains a threat of reprisal or force or promise of benefit. * * *

1(d) "In any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form labor organizations, to join or assist Textile Workers Union of America, C.I.O., or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, or to refrain from any and all such activities * * *."