Charles CRAGGETT, a minor, by his next friends and parents, Charles A. Craggett and Daisy Craggett, et al., Plaintiffs,

v.

BOARD OF EDUCATION OF the CLEVELAND CITY SCHOOL DISTRICT, CUYAHOGA COUNTY, OHIO, et al., Defendants.

Civ. A. No. C 64–369.

United States District Court
N. D. Ohio, E. D.
July 2, 1964.

Robert L. Carter, Gen. Counsel, Nat'l Assn. for Advancement of Colored People, New York City, Louis Stokes, Clarence H. Holmes, James A. Haynes, Russell T. Adrine, Albert R. Gamble, Raymond Basie, Rufus Breland Jr., Jack

G. Day, Joseph E. Finley, Robert L. Merritt, Ralph Rudd, Melvin S. Schwarzwald, Charles H. Taylor Jr., Cleveland, Ohio, for plaintiffs.

Irwin L. Silbert, B. J. Klementowicz and Geo. J. Dinda, and D. J. O'Loughlin, S. A. Terrell, Terrell, Williams & Salim, R. Wm. Bashein, Herbert I. Goulder, David Ralph Hertz, Hertz & Kates, Daniel W. Hammer, Richard F. Patton, Joseph L. Newman, Cleveland, Ohio, for defendants.

KALBFLEISCH, District Judge.

Plaintiffs have moved for a preliminary injunction to halt construction on three new elementary schools in the Cleveland School System. This motion will be denied.

Within the last five years some children in the Cleveland School System were attending double session schools, that is, they were on half school days. Parents of the children who did not have a full day session complained to the Cleveland Board of Education, hereinafter referred to as the "Board". Letters were written suggesting, among other things, that these children be transported to schools capable of receiving them. During a Board meeting on October 23, 1961, a resolution was adopted directing the Superintendent of Schools to institute a procedure for transportation of children to other schools. On November 9, 1961 the Board approved the plan of transportation submitted by the Superintendent to be effective with the opening of the second semester, January 29, 1962. Pupils were to be transported in class units, with the class teacher accompanying each class. During his testimony, the Superintendent gave his reason for doing this and the general policy in regard to transporting children, as follows:

"A.   They are kept in what we call an administrative unit, the plan being to send their teacher of the home school to what we call the receiving school. They went as an administrative unit. They were not entirely apart, if apart means they never had associations with the other schools. There were extra activities and things of that nature. But essentially, in their classwork, they were in their own administrative unit, *the assumption being that when the new schools were built they were going back into their neighborhood.* It would be easier to reinstitute the administrative development because they were still part of it." (Emphasis added.)   (Tr. 20–21.)

Plaintiffs' case is concerned with the transportation of approximately 1000 pupils from Hazeldell Elementary School to three other elementary schools: William H. Brett, Memorial, and Murray Hill. Apparently the Board had adopted a standard by which it measured the number of pupils that could be educationally accommodated in each of its school buildings, commonly referred to as the school's capacity. Hazeldell's enrollment first exceeded its capacity in 1960, and the transportation plan succeeded in reducing Hazeldell to capacity or slightly above it. In 1961 Hazeldell had an enrollment of 1418, of which 578 were Negroes. In 1962 there were 1294 Negro pupils in an enrollment of 1890, and in 1963 there were 2048 Negro pupils in an enrollment of 2388. The Superintendent testified he knew most of the transported children were Negroes. (Tr. 21.) The schools to which Hazeldell pupils were transported did not have over 3% Negro enrollment.

Subsequent to initiation of the transportation plan, parents of the transported pupils and other interested groups began protesting to the Board on the ground that these children were being isolated at the receiving schools. Various meetings were held between the Board and interested groups and on September 30, 1962 the Board adopted a resolution providing for "the fullest possible incorporation" of transported pupils into the receiving school organiza-

tions consistent with sound educational procedures. At the same time the Board resolved to create an "ad hoc" Citizens' Council on Human Relations. This Council, among other things, was charged to study and make recommendations to the Board on how to devise means to:

"1) Serve as an internal organ to eliminate whatever discriminatory practices may exist in the Cleveland School System.

\*　\*　\*　\*　\*　\*

"5) Develop and put into effect by September, 1964 a plan concerning meaningful integration of Cleveland classrooms taking into consideration the rights, privileges and interests of all elements of our community." (Plaintiffs' Ex. #1, p. 366).

The Council on Human Relations made recommendations on March 31, 1964.

Upon learning that the Board had provided for "the fullest possible incorporation" of transported pupils the residents in the area of the receiving schools, by petition and by public meetings, requested the Board to revert to the Board's previous plan regarding transported pupils. Subsequent to the meetings held with representatives of said residents, the Board on November 11, 1963 adopted the following resolution:

"Resolved, that the Board of Education hereby establishes as its continuing policy for the government of the Cleveland Schools that each child shall attend the school nearest to his home and that exceptions shall be made in this policy only when facilities are unavailable in the child's immediate neighborhood in any given case. The Board hereby reaffirms its commitment to the concept of the neighborhood school." (Plaintiffs' Ex. 1, p. 418.)

Plaintiffs claim one of the Board members, on February 4, 1964, while talking to a group of demonstrators, told them not to picket because the Board was about to meet with their representatives and hopefully would reach some accord and would hopefully agree to integrate the bus transported children. Later in the day a tentative resolution was promulgated which was adopted officially on February 10, 1964:

"We the members of the Cleveland Board of Education hereby affirm our policy of establishing and maintaining a full and uniform standard of education for all children in the City of Cleveland.

"Every child will be entitled to participate in every student activity offered by the school he attends.

"We hereby direct the Superintendent forthwith that all pupils being transported from schools due to overcrowding shall be incorporated in the school organization as though they were in the local school district, and the pupil records and other necessary data will be forwarded to the receiving schools.

"The administration is hereby charged to use all appropriate possible techniques to achieve this end forthwith.

"The Board will terminate the transportation classes as soon as possible with whatever means the Board has available and deems advisable.

"We hereby direct the Superintendent forthwith that all pupils being transported from schools due to overcrowding shall be incorporated in the school organization as though they were in the local school district, and the pupil records and other necessary data will be forwarded to the receiving schools.

"The administration is hereby charged to use all appropriate possible techniques to achieve this end forthwith." (Plaintiffs' Ex. 2, pp. 48–49.)

During the second semester the transported pupils were substantially incorporated into the receiving schools.

Plaintiffs now are protesting the construction of three new elementary school

buildings which are planned in Zone 11, the zone in which Hazeldell is situated, and which will end the need for transporting pupils to other schools. Two new schools are planned on Lakeview and Woodside sites, and an addition is planned at Rosedale, an existing school. The Superintendent said he presumes the Lakeview School will be predominantly Negro, considering the residential makeup of the area. The same, in varying degrees, is true of the schools on the Woodside and Rosedale sites. The area to be accommodated by the new construction had not been prescribed by metes and bounds at the time of the trial, but it is apparent that the three new schools will be composed largely of Negro children, according to the testimony of the official in charge of initially drawing the new boundaries.

The land has been cleared on all three sites, and by June 2, 1964 construction was in progress on two of the sites. The record shows that as early as September 9, 1963 the Board had taken action in regard to the Woodside site, and on December 2, 1963 the Board had authorized the cost of demolishing buildings, removing rubble, and filling basements on the three sites. Outside architects were employed to plan architectural designs for the three schools; however, two of said architect contracts concerning Lakeview and Rosedale were cancelled because the architects could not complete the designs speedily enough. The Board had previously approved a design for the Warren Replacement school, a design which was now approved for the Lakeview and Rosedale construction. Generally, the design for one school does not have the identical specifications as those for any other school due in part to the difference in the sites and in available materials, and to changing educational requirements. The Warren Replacement school has a larger site than Lakeview and Rosedale. In the last fifteen years about twenty-five new schools have been built. Every school design except the two which were copied from the Warren Replacement design

have been presented to the City Planning Commission for recommendation and approval.

The City Planner testified that in his opinion Lakeview should not be built on a major city thoroughfare, and further testified that the Superintendent and the Chief of the Bureau of Housing, Equipment and Supplies had informed him that the need to alleviate the crowded conditions required the use of the site, and that by using guards and building a wall the proposed site would be safe. The Commission objected to Woodside because it felt the site was too small to contain a thirty-classroom school.

An additional meeting was held between the United Freedom Movement and members of the Board on April 8, 1964. Witness Gunn testified that a "tentative agreement" was made between four of the Board members and the United Freedom Movement. The tentative agreement was said to be a four-phased plan: (1) Any construction started on the three new schools would be stopped for two weeks and the Board would negotiate with the United Freedom Movement. In exchange the United Freedom Movement agreed not to demonstrate at the school sites during the two weeks. (2) Some nationally known experts would be consulted in order to resolve the question of integrating the schools in Cleveland. (3) A committee was to be set up to meet with the Board. (4) The Board would not enter into a contract for the construction of Woodside in exchange for a promise not to demonstrate at any of the school sites. Gunn further testified that at this meeting one of the Board members suggested that perhaps construction should be stopped on all three school sites in view of the fact many Negroes then present were against the construction.

Plaintiffs have emphasized that their case is not one coming within Bell v. School City of Gary, Indiana, D.C., 213 F.Supp. 819 (1963); 324 F.2d 209 (7 Cir., 1963), cert. den. 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964), but rather is a case within the purview

of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The meaning of the Brown decision was explained by the Supreme Court in a subsequent decision when the Court said that Brown "decided that *enforced* racial segregation in the public schools of a State is a denial of the equal protection of the laws enjoined by the Fourteenth Amendment." Cooper v. Aaron, 358 U.S. 1, 5, 78 S.Ct. 1401, 1403, 3 L.Ed.2d 5, 19 (1958). (Emphasis added.) Plaintiffs have recognized that in order for them to prevail the Court is required to find proof that the Board had an unconstitutional intent to enforce segregation. Plaintiffs also admit that no direct proof of such an intent has been offered, but they contend that from the facts shown the Court can infer that such an intent did exist.

The Court should point out the general requirements for obtaining a preliminary injunction. A showing of irreparable injury must be made. Speedry Products, Inc. v. Dri Mark Products, Inc., 271 F.2d 646 (2 Cir., 1959); Sims v. Greene, 161 F.2d 87 (3 Cir., 1947). It also must be remembered that plaintiffs are not required to present evidence necessary to a decree after the trial, but must present sufficient evidence that there is at least a reasonable probability of success in their main action. Speedry Products, Inc., supra. Finally, granting a preliminary injunction is largely a matter of judicial discretion. Huard-Steinheiser, Inc. v. Henry, 280 F.2d 79 (6th Cir., 1960), and in determining whether an injunction should be granted the Court is permitted to balance the respective equities and determine where the lesser damage lies. Arthur Kahn Co. v. Switzer Bros., 101 F.Supp. 541 (N.D.Ohio, E.D., Jones, J., 1951), appeal dismissed 201 F.2d 55 (6 Cir., 1952).

The Court notes that plaintiffs filed this complaint and motion for preliminary injunction many months after the Board initiated the building program now sought to be enjoined. Contracts have been awarded and defendant-contractors have begun construction on the Lakeview and Rosedale sites. Any delay caused by an injunction will necessarily impose a financial burden upon the contractors. The injunction sought, if granted, would necessitate continued transportation of classes and the cost it involves. Realization of these possibilities compels the Court to consider carefully plaintiffs' grounds for a preliminary injunction.

Plaintiffs' theory is that there will be resegregation when the transportation of pupils to William H. Brett, Memorial, and Murray Hill schools is terminated. They claim the unconstitutional intent of the school authorities to enforce segregation can be inferred upon the following hypotheses: (1) The Board had knowledge that the transported children are Negro, and that they currently are attending schools composed predominantly of white children. (2) The Board further believes and intends that the construction of the new schools will terminate transportation, resulting in the transported pupils being returned to their own neighborhood schools which are predominantly Negro. (3) The Board decided to terminate transportation of classes only after pressure was applied by white adults who wanted to end the integration achieved by the transportation. (4) Proof that the Board wanted to end integration and resegregate the transported children is shown by the fact that the Board hastily accelerated the proposed building program by discharging architects, using an old design for two of the schools, and not getting Planning Commission approval of two sites. (5) Intent also is shown by the fact that the Board has not yet acted on the March 31, 1964, proposal of the Citizens' Council of Human Relations, nor has it acted upon the tentative agreement of April 8, 1964. (6) Plaintiffs assert that intent also is shown by the statements allegedly made by a Board member to demonstrators that the Board would hopefully integrate the transported children. The Court rejects the plaintiffs' theory.

■ Mere knowledge that the schools would terminate transportation and return the Negro children to their predominantly Negro neighborhood schools does not permit an inference of intent to do anything beyond the Board's legal duty. The assumption that the school authorities had this knowledge would pose the following question: "Is the Board of Education building the new schools at their present locations in a deliberate effort to enforce segregation or for other perfectly valid reasons?" Before answering this question, it must be remembered that public officials are presumed to have properly discharged their duties. United States v. Chemical Foundation, Inc., 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131 (1926); In re State Thread Co., 126 F.2d 296 (6th Cir., 1942); Donaldson v. United States, 264 F.2d 804 (6th Cir., 1959); Goldberg v. Truck Drivers Local Union No. 299, 293 F.2d 807 (6th Cir., 1961) cert. den. 368 U.S. 938, 82 S.Ct. 379, 7 L.Ed.2d 337 (1961); Davis v. Arn, 199 F.2d 424 (5 Cir., 1952); National Labor Relations Board v. Bibb Mfg. Co., 188 F.2d 825 (5 Cir., 1951). Furthermore, the State of Ohio requires that the Board of Education shall provide free education "at such places as will be most convenient for the attendance of the largest number thereof." R.C. Section 3313.48. The presumption that the Board has faithfully adhered to the Ohio statutes will control until rebutted.

■ Examination of the evidence reveals no trace of a deliberate design to segregate. On the contrary, the facts tend to prove the Board has adhered to state and federal law. The school zone lines have remained unchanged since the 1920's. Zone 11 became overcrowded through no change in boundaries or other action of the Board, and as a result of the overcrowding the pupils had to be transported to other schools. The increase in the percentage of Negro pupils attending schools in Zone 11 has been extraordinary. As enrollment of pupils in Zone 11 schools has approximately doubled since 1952, the percentage of Negro pupils in Zone 11 schools has risen from approximately 44% to approximately 98%. More importantly, the exhibits show that in 1952 Hazeldell had 25 Negro pupils in an enrollment of 1155; whereas in 1963 there were 2048 Negro pupils in an enrollment of 2338. This increase was not due to an intentional shifting of boundary lines, but was caused by more Negroes moving into the area. The three new schools are being built to end the overcrowding in Zone 11 schools and to end the necessity for transportation. It appears from the Superintendent's testimony that the transportation was intended to be temporary, and further that the concept of neighborhood schools was to be followed whenever possible. The Chief of the Bureau of Housing, Equipment and Supplies testified that, in general, the elementary school services the area in which it is located. This concept was reaffirmed by the Board in its resolution of November 11, 1963, quoted earlier. It also appears that the new schools for Zone 11 were contemplated at the time the transportation classes were begun. The Chief of the Bureau of Housing, Equipment and Supplies testified that the racial composition of the neighborhood is not taken into consideration in determining whether a zone line is to be crossed. (Tr. 114.) Mr. Hartman said that to his knowledge "no school or boundary line has ever been set with color lines in mind." (Tr. 118.) This witness is the official charged with initially drawing the boundary lines. (Tr. 114.)

The Court recognizes the departure from normal procedure involved in planning the building designs for Lakeview and Rosedale; however, an intent to segregate cannot be inferred from this, particularly in view of the fact that the Warren Replacement school design had previously been approved. Plaintiffs argue that when the conduct of the Board is noted in conjunction with the pressure exerted by persons residing in the area accommodated by the receiving schools the Court may infer such an intent. The members of a school board

are elected to office. It is inherent in the democratic process that a body politic is subjected to pressures. To infer an unconstitutional design when that body exercises its discretion in accord with law requires substantial evidence. The most this Court will infer from the facts is that the Board desired to end transportation classes as soon as possible for the reason its general policy was to maintain neighborhood schools—a concept which has been declared constitutional. Bell, supra. The evidence adduced shows the Board has met the following test declared by the Sixth Circuit:

"there cannot be 'Negro' schools and 'white' schools. There can now be only schools, requirements for admission to which must be on an equal basis without regard to race.

"Minimal requirements for nonracial schools are geographic zoning, according to the capacity and facilities of the buildings and admission to a school according to residence as a matter of right." Northcross v. Board of Education of City of Memphis, 302 F.2d 818, 822–823 (6th Cir., 1962), cert. den. 370 U.S. 944, 82 S.Ct. 1586, 8 L.Ed.2d 810 (1962).

Dr. Levenson, the Superintendent, testified:

"My point of view was this: if the children were going to be accepted, not just tolerated, * * * that we must work very closely with the parents, have prior meetings, acquaint the parents with what is coming, so they will be accepted amply and enthusiastically, rather than resentfully. As I indicated my concern is with all children, regardless of race, with the hope they will get the best education. That was my concern. (Tr. 42.)

This statement, the tentative agreement of April 8, 1964, and the Board resolution of September 30, 1963 clearly evidence the Board's deep concern with a problem of national proportions which is no less difficult to resolve to everyone's satisfaction because it involved only Cleveland school children. The evidence clearly shows the Board felt neighborhood schools were more desirable than transported classes. Recognition of the problem of racial imbalance, caused through no fault of the Board, does not mean the Board has an affirmative duty to relieve the problem. Bell, supra. If the Court were to halt construction solely on the basis that the schools will have an enrollment of predominantly Negro children the Court would be doing the very thing it refused to do in Lynch v. Kenston School District Board of Education:

"Plaintiffs * * * do not have a constitutional right to attend or to refrain from attending a particular school on the basis of racial considerations when there has been no actual discrimination against them. The law is color-blind and, in cases such as this, that principle, which was designed to insure equal protection to all citizens, is both a shield and a sword. While protecting them in their right to be free from racial discrimination, it at the same time denies them the right to consideration on a racial basis when there has been no discrimination." (229 F.Supp. 740, N.D.Ohio, E.D., 1964, Kalbfleisch, J.)

The plaintiffs offered no evidence of an irreparable injury and rested on the assertion that their constitutional rights would be violated. As this hearing progressed, the Court became increasingly impressed with the credibility of the school authorities who were called as witnesses. From my observation of their behavior on the stand, their candor and forthright testimony, and my consideration of all other evidence, I have an abiding conviction that the plaintiffs' allegation that defendants were guilty of an intent or design to enforce segregation in the Cleveland School System has no foundation in fact.

The Court will overrule plaintiffs' motion for a preliminary injunction.

Counsel are instructed to proceed with the prosecution of the McAllister motion to dismiss the complaint.

The foregoing is adopted as findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.