**Elmer H. DUDLEY and Premises at the Rear of 1131 Boulevard Avenue, S. E., Atlanta, Georgia**

v.

**UNITED STATES of America.**

**Civ. A. No. 12988.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Jan. 6, 1970.

Joe Salem, Atlanta, Ga., for plaintiff.

Dougald D. McMillan, Trial Atty., U. S. Dept. of Justice, Miami, Fla., J. Robert Sparks, Trial Atty., Crim. Div., Organized Crime and Racketeering Section, Atlanta, Ga., for defendant.

SIDNEY O. SMITH, Jr., Chief Judge.

This is a civil proceeding in which the movant seeks to suppress and have returned certain evidence obtained as the result of a search effected on his premises by federal agents on July 3, 1969. The motion is made prior to indictment and seeks to enjoin the use of any such evidence before a Grand Jury for such purposes. Federal Rules of Criminal Procedure 41(e); In re Fried, 161 F.2d 453 (2d Cir. 1947).

The case arises out of an investigation of interstate gambling activities centered in Miami, where a wire tap had been authorized under 18 U.S.C.A. § 2516. In a similar proceeding in the Southern District of Florida, the legality of the wire-tap has been sustained by Judge Mehrtens in an order issued September 2, 1969 (No. 69–4–Misc.—Civil). Except insofar as noted hereafter the use of the information obtained therein is no longer in question. However, the original authorization by the court was inadvertently not dated at the time of issuance and was nunc pro tunc dated June 17, 1969, by the September 2nd order of Judge Mehrtens, which was after the Atlanta search warrant issued.

The search warrant in question issued in Atlanta on July 2, 1969, by Frank A. Holden, United States Commissioner upon (1) the affidavit of Donald P. Burgess, an Atlanta FBI agent, sworn to before the Commissioner and (2) the affidavit of Edwin J. Sharp, a Miami FBI agent, sworn to before the United States Commissioner there and presented by Agent Burgess and incorporated by reference into his own affidavit.

Under those circumstances, the movant contends that no probable cause existed for the issuance of the Atlanta search warrant and the subsequent seizure of items of real evidence from him. He specifically raises the following objections:

(1) That the wire-tap information contained in the Sharp affidavit could not be considered by the issuing magistrate because the authorization order was not dated at the time.

(2) That the Miami affidavit of Agent Sharp could not be considered

by the issuing magistrate because of his absence from the court.

(3) That the Atlanta affidavit of Agent Burgess, insofar as hearsay is concerned, could not be considered by the issuing magistrate and, therefore, did not constitute probable cause.

(4) That, in any event, some $10,000 in cash and certain credit cards seized in the search should be returned to him.

### (1) THE NUNC PRO TUNC ORDER

The thrust of movant's position here is that inasmuch as the authorization order was undated when the Atlanta search warrant issued there is no way the issuing magistrate could determine if the wire-tap information contained in the Sharp affidavit and incorporated in the Burgess affidavit was obtained within the dates specified. This objection relates to the propriety and effect of the subsequent nunc pro tunc order.

■ As to the effect of the order itself, Federal Criminal Rule 36 clearly gives the issuing court the power to correct the order to show the true date. See also Wilson v. Bell, 137 F.2d 716 (6th Cir. 1942). Such correction has been accomplished in this instance by Judge Mehrtens on September 2, 1969. *Nunc pro tunc* orders, by their very nature, are generally retroactive in effect and here there has been a judicial determination that June 17th was in fact the true date. The question remains whether the issuing magistrate properly considered the information under the circumstances. In this connection, it appears that legal orders may properly be executed even though some omission is later furnished *nunc pro tunc* and likewise, upon subsequent review, may properly be considered effective as of the true date. Judge Mehrtens has done so in this very instance. In search warrant cases, the date has been supplied after execution. United States v. Matellian, 31 F.R.D. 233 (D.Mass.1962); United States v. Hertel Athletic & Social Club, Inc., 25 F.2d 872 (W.D.N.Y.1928). Similar technical omissions are correcti-

ble in the same manner. United States v. Averell, 296 F.Supp. 1004 (E.D.N.Y. 1969) (absence of affiant's name); Hanger v. United States, 398 F.2d 91 (8th Cir. 1967) (absence of owner's name).

■ Moreover, there is a strong presumption of the correctness and legality of acts done in the discharge of official duties unless and until the contrary is made to appear. *E.g.*, United States v. Chemical Foundation, 272 U.S. 1(11), 47 S.Ct. 1, 71 L.Ed. 131 (1926); Continental Bank & Trust Co. v. Brandon, 297 F.2d 928(3) (5th Cir. 1962). This presumption has been held to apply specifically to the Department of Justice. In re Coleman, 208 F.Supp. 199 (S.D.Miss. 1962), aff'd Coleman v. Kennedy, 5 Cir., 313 F.2d 867; United States v. One 1941 Cadillac, 145 F.2d 296 (7th Cir. 1944). And to peace officers. NLRB v. Bibb Mfg. Co., 188 F.2d 825(2, 3) (5th Cir. 1951); Bertram v. Citizens National Bank, 283 F.2d 783(1) (6th Cir. 1960). The issuing magistrate had a right to rely on this presumption at the time he approved the search warrant.

■ Therefore, it is concluded that the absence of the date in the authorization order did not preclude consideration of the wire-tap information and the *nunc pro tunc* order effectively corrected any deficiency therein.

### (2) THE SHARP AFFIDAVIT

In connection with the Miami affidavit, the movant raises two objections: (a) that the affidavit per se could not be considered by the issuing magistrate because of the absence of the affiant from the court and (b) that it could not be considered as incorporated in the Burgess affidavit on the grounds that it constitutes hearsay.

(a) The first objection raises a very narrow question and one on which there is practically no authority. Rule 41(c) itself provides that "a warrant shall issue *only* on affidavit sworn to before the judge or commissioner and establishing the grounds for issuing the warrant

(Emphasis supplied)." Moreover, it is clear from what follows in Rule 41(c) that the "judge or commissioner" referred to is the issuing magistrate himself and not some other non-issuing magistrate before whom some affidavit may be given. The only authority in point found is the case of Rose v. United States, 45 F.2d 459 (8th Cir. 1930). There, at 464(5), the court stated:

"The only person appearing before the United States Commissioner was Splawn, and he had no personal knowledge of the facts; all he had was a belief based upon the affidavit of Kazakes which he produced. The testimony of Splawn was therefore clearly hearsay, and the commissioner was not authorized to act upon it. Neither was the affidavit of Kazakes such evidence as would authorize the commissioner to issue a search warrant. The affidavit was not such evidence as would be admissible before the commissioner. Kazakes did not appear before the commissioner. There was no showing who he was; nor that he was mentally competent to make an affidavit. There was no showing of the purpose for which the affidavit was made, nor the circumstances under which it was made. There was no showing how the affidavit was obtained by Splawn; nor from whom; nor the circumstances under which it was obtained. All this could and should have been elicited if Kazakes had appeared for examination before the commissioner."

■ Admittedly, *Rose* is fairly ancient authority and precedes by many years newer developments in the area of probable cause. An opportunity to rule on the question was present in United States v. Whitlow, 339 F.2d 975 (7th Cir. 1964) where the affiant's affidavit before the issuing magistrate was apparently based solely on the affidavits of two other persons, neither of whom was an officer and for whose reliability no evidence was offered. In holding the evidence insufficient, the court relied on the absence of reliability rather than the

absence of the person from the court. However, the theory is the same and the court is constrained to hold that the affidavit of another standing alone cannot form the basis for the issuance of a warrant. This is tantamount to a holding that the Sharpe affidavit alone if presented by another, or mailed to the commissioner, could not form the basis upon which to issue the warrant.

(b) However, in this instance, the Sharpe affidavit was incorporated into the affidavit of agent Burgess who did appear under oath before the issuing magistrate and its consideration in this posture is controlled by a determination of the weight afforded the Burgess affidavit by the magistrate.

### (3) THE BURGESS AFFIDAVIT

■ Without doubt the affidavit of Burgess contains considerable hearsay, but in each instance it is a far cry from the hearsay of an admitted thief as in United States v. Whitlow, *supra* or of some unknown informer as in Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) or Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) whose reliability is not demonstrated to the issuing magistrate. To the contrary, the hearsay present in the Burgess affidavit consists exclusively in the observations of fellow officers. Under such circumstances, the matter is controlled completely by Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964) and United States v. Ventresca, 380 U.S. 102, 85 S. Ct. 741, 13 L.Ed.2d 684 (1965) and is typified by the results reached in United States v. Plemmons, 336 F.2d 731 (6th Cir. 1964) and Lopez v. United States, 370 F.2d 8 (5th Cir. 1966). These cases stand for the proposition (1) that hearsay itself can form the basis for the existence of probable cause if it is reliable or otherwise corroborated and (2) that observations of fellow officers engaged in a common investigation are plainly a reliable basis for a warrant applied for

by one of their number. *Spinelli* and *Aguilar* notwithstanding, these standards remain firm in our law of search and seizure. Such is the case here. Inasmuch as Burgess properly swears to the observations of fellow officers in Atlanta, it follows that he could swear to the observations of another fellow officer, Sharpe, in Miami. Here, the hearsay of Sharpe is even more reliable as it is contained in an extensive affidavit adopted by Burgess and presented to the magistrate. Such procedure, inferred as proper in *Whitlow* grants the magistrate an even better opportunity to test reliability in evaluating the affidavit of the affiant before him. As such, it furnishes a stronger basis for the protection of Fourth Amendment rights of the citizens.

Measured by the above, there is no hesitancy in concluding that sufficient evidence of probable cause was adduced to authorize the issuance of the Atlanta search warrant. The identity of information and time between the Atlanta-Miami telephone calls plus the observations of physical movements in Atlanta satisfy the requirements. Based on the "totality of circumstances" presented to the magistrate and applying the "rule of reason" (see Clay v. United States, 246 F.2d 298(2) (5th Cir. 1957), probable cause existed.

Law enforcement generally and search procedures specifically must be viewed in a practical and common-sense manner. Viewed in such light can it seriously be doubted that probable cause is not found in the 24 typewritten pages of affidavits furnished here? The court thinks not and the search ought to be approved unless substantial constitutional rights have been violated by the issuance of the warrant. None is shown here and the court holds that the warrant properly issued.

### (4) THE "INSTRUMENTALITIES OF CRIME"

It is undisputed that the cash and credit cards were taken from the person of the movant in the course of the search conducted under the lawful warrant. As such, the government contends that they are legally held as "instrumentalities of crime" even though they do not relate to the crime under investigation. There is no contention made that such articles were taken as incident to a lawful arrest. In short, the government contends that there are no limits to seizure in an otherwise lawful search, if the article constitutes the evidence or instrumentality of *any* crime.

■■ In this connection, it is apparent that items not named in the warrant, but seized in connection with the crime under investigation are proper. *E.g.,* Bryant v. United States, 252 F.2d 746 (5th Cir. 1958). A typical example is when a warrant is obtained for the search of goods stolen in a burglary and burglary tools are discovered in the subsequent search, or some other stolen goods. Johnson v. United States, 110 U.S.App.D.C. 351, 293 F.2d 539 (1961). A further area of permissible search is when the article itself relates to another crime being committed in the presence of the officers at the time of search. Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). Another is when the possession of the article itself constitutes a crime and is, therefore, tantamount to the commission of a crime in the presence of the searching officers. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). Of course, if the item is named in the warrant and therefore properly seized it may be the basis for prosecution of another offense. *Gouled* v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921).

■ However, insofar as the cash and credit cards taken from the person of the movant, there was no proof at the time that either was the instrumentality of a crime per se. The possession of cash or the possession of a credit card in another's name is not per se a violation of state or federal law. They must be

used [1] in some illegal manner before they became instrumentalities of crime. Thus, if the cash were found on a table with gambling slips, there would be grounds to conclude that it was being so used and it would be seizable in connection with the crime under investigation. However, no such circumstances are present here and the seizure cannot be justified on the basis of the exceptions noted.

█ A reading of the leading cases in the area convinces the court that another exception should apply. That is, *if the searching officers have probable cause to believe that an article* (not named in the warrant but found in an otherwise lawful search) *will aid in a particular apprehension or conviction*, it may be seized. This is strongly hinted in the recent case of Warden Md. Penitentiary v. Hayden, (1967) 387 U.S. 294 at 307, 87 S.Ct. 1642, 18 L.Ed.2d 782 and the cases reviewed therein. Examples of the propriety of such a holding are easy to suggest. Thus, if a searching officer has previously investigated a theft from the XYZ store of certain items and upon a search discovers the items marked with the XYZ tags, it would follow that he had probable cause on the spot to seize the article. In such respect, probable cause may not be satisfied after-the-fact by a seizure and then relating it back to some information on some police record, but where the knowledge is possessed by the searching officer at the time, or obtained during the course of the search, it may be properly seized. Of course, mere general suspicion will not suffice, the circumstances must relate to a *specific* and *particular* offense.

Here, this exception applies to the credit cards. On the occasion in question, five credit cards were taken from the premises, which consisted of a 12′ x 12′ cement block house with iron barred doors and windows. Of these, three were taken during the search of the person of Dudley, from his pocket, to wit:

(1) Sears, Roebuck credit card in name of Conger;

(2) Texaco credit card in name of Snellings;

(3) Texaco credit card in name of Rosenthal.

Two additional cards were taken from an attache case behind Dudley's desk chair, to wit:

(4) Mobil Oil credit card in name of Jacobs;

(5) Gulf Oil credit card in name of Snow.

At the time, the searching officers were armed with the information that one Gilbert Lee Bleckley was an associate of Dudley's; he had been observed with Dudley at the premises in question during a surveillance early on May 12th and at other times; later, on May 12, 1969, Bleckley was observed at Gate 45, Delta Air Lines, Atlanta airport boarding a flight; the ticket he presented was examined by agent Ogden and found to be issued in the name of "T. Sanders" on a Diner's Club credit card in the name of one Morris Strausberg. Between May 12th and the search in question, it had been confirmed through fellow officers in New York that the Strausberg card was stolen and had been used to purchase some 41 unauthorized air line tickets. All of such knowledge was possessed by Agents Burgess and Ogden at the time of the search.

Found in the attache case was a validated airline ticket issued on a Diner's Club credit card belonging to Morris Strausberg. Also found therein were some 80 other validated airline tickets issued in 13 different names on 14 different credit cards for popular flights between Atlanta, New York and Miami together with a set of validating stamps and a supply of blank validated Georgia driver's licenses.

█ Found in the desk drawer of the premises was an Eastern ticket is-

1. See Ga.Code § 26–2814; 18 U.S.C. § 1708; 18 U.S.C. § 3103a.

sued on a Diner's Club card in the name of H. Platt, together with various other credit cards in the name of "Conger" (1) and "Eubanks." Immediately while the search was going on, Agent Ogden telephoned the Atlanta FBI office, which in turn contacted the New York FBI office and ascertained that the H. Platt card was stolen, and the information was immediately relayed to the scene. Thus, both Agents Ogden and Burgess were possessed with this information during the search. Ogden unsuccessfully tried to reach Conger by telephone also. On this basis, all five cards were seized.[2]

Tested by this information [3] known to the searching officers previously or ob-

tained during the course of the search, it is concluded that probable cause existed to believe that seizure of the cards would aid in a particular apprehension or conviction. The fact that none of the five cards in question were known to have been stolen or illegally used is not determinative. Their presence, together with the Strausberg ticket similar to that known to have been used by Bleckley, and coupled with the Platt card, found at the time to have been stolen; and with the countless other tickets, cards, and paraphernalia indicative of a specific and particular violation, is sufficient to warrant the seizure of them all. The officers were justified in concluding that Dudley and/or Bleckley ille-

---

2. At the time cards (1), (2), and (3) were taken from Dudley's person, the government contends that he told the agents they were not his and that "You can have them." At the least the following transpired in Dudley's own words:
   "He looked in my shirt pocket in searching me, and there were two or three credit cards."
   "He took the credit cards out of my pocket and told them to write the names down on the list of items that they were taking from me, and if you will look at the list of items, you will see that the credit cards are right in the middle. In other words, everything they took, they took an inventory. He took the credit cards, laid them down on the desk, and the other credit cards were laying on top of the desk, and he didn't bother them. He asked me where did they come from, and I told him that someone had brought them in to leave them to see if I would sell them. And I told him that I didn't want to sell them, that I didn't want the credit cards. I didn't tell them he could have them, I merely said that I didn't want the cards from the party that had brought them in and left them. As I stated, they were not my credit cards— some one had left them there and I did not want the credit cards. I wanted to return them, and I did return part of them."
   Under these circumstances, the government contends that the disclaimer of ownership constituted such abandonment as made the articles subject to seizure under such authorities as Abel v. United States, 362 U.S. 217 at 240–241, 80 S.Ct.

683, 4 L.Ed.2d 668 (1960) and Elledge v. United States, 359 F.2d 404 (9th Cir. 1966). The theory is that the party loses the requisite standing to complain. United States v. Grosso, 358 F.2d 154 (3rd Cir. 1966); Woodring v. United States, 367 F.2d 968 (10th Cir. 1966). The position appears to be well-taken and the court would so rule if necessary to a disposition of this case.
Of course, the government does not have to disprove at this time the claim that the cards were left by someone else. That is a matter of defense to explain their possession in a subsequent prosecution. E. g. Thurmond v. United States, 377 F.2d 448 (5th Cir. 1967).

3. The testimony also reveals (1) that the searching officers had previously heard that Dudley was a "dealer" in stolen credit cards, but had no knowledge of specifics and no corroboration at the time, (2) that all five cards were subsequently found to be stolen or lost, and (3) that the Conger card was missing after a burglary of his home reported to the local police on July 1, 1969, but unknown to the searching FBI officers at the time. In the court's view, none of such information aids the search. Item (1) constitutes mere general suspicion and would have been insufficient to obtain any kind of warrant or seizure. Items (2) and (3) constitute after-acquired information which could not aid in a determination of probable cause as of the time of the search. Such facts, of course, would prohibit their return to Dudley, even if illegally seized and subject to a motion to suppress.

gally possessed or used them and the exception previously discussed is met.

The exception, however, is not satisfied insofar as the cash is concerned. Nor would it constitute contraband absent proof of use, not present here, so as to subject it to possible forfeiture under the "Angelini" and "Dean"-type cases, now pending before the Supreme Court. Moreover, there is no more probative value to cash itself than to testimony that the same cash was recovered. In some future inquiry, the government is free to use such testimony if relevant. However, the cash itself must be returned.

Accordingly, it is the order of the court that the cash seized be so returned. Otherwise, the motion to suppress is denied.

It is so ordered.