**UNITED STATES of America,**
**v.**
**Nicholas MAINELLO et al.,**
**Defendants.**
**No. 71–CR–401.**

United States District Court,
E. D. New York.

June 29, 1972.

Robert A. Morse, U. S. Atty., E. D. N. Y., for the United States; Denis E. Dillon, Brooklyn, N. Y., Atty. in Charge Organized Crime Section, James O. Druker, and Richard L. Shanley, U. S. Dept. of Justice, Brooklyn, N. Y., of counsel.

Elliot A. Taikeff, New York City, for defendants.

## OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION

TRAVIA, District Judge.

This case came on for trial on January 3, 1972. The defendants, Nicholas Mainello, Peter Candarini and Joseph Candarini, now before the court, along with twenty-eight other persons, were indicted on April 21, 1971.

The two count indictment charges substantive violations of Section 1955 of Title 18, United States Code, and conspiracy to violate the same statutory provisions in contravention of Section 371 of Title 18, United States Code.

Of the twenty-eight other defendants, three pleaded guilty to Count One (Conspiracy) and twelve pleaded guilty to Count Two of the indictment; eight defendants were severed for various reasons; and the indictment was dismissed as against five.

Each of the three remaining defendants, after having been advised of his right to a trial by jury, consented, in accordance with Rule 23, Fed.R.Crim.P., to have the case tried by the court without a jury.[1] They have also agreed with the Government to have the case tried on a series of exhibits without defense objection, except that the defense reserved the right to move for the suppression of certain evidence on the ground that it was obtained in violation of the Fourth Amendment. Defendants raise certain other arguments and seek further relief, including a judgment of acquittal and dismissal of the indictment against them.

This court will first treat with defendants' suppression and other "pretrial motions." Findings of fact and conclusions of law will follow.

## I. "PRETRIAL MOTIONS"

Defendants seek various types of relief usually sought prior to the commencement of trial. Their most important motion is one to suppress evidence

---

1. Court Exhibits 1, 2 and 3.

obtained through electronic surveillance. Its primary target is Government Exhibit 1, which consists of selected portions of transcripts of conversations overheard at 2264 Bath Avenue, Brooklyn, New York, during the period from November 25, 1970 through January 23, 1971. The conversations were overheard by the use of electronic surveillance authorized by this court in a series of orders [2] issued pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 ("Title III"). Defendants challenge the propriety of this court's orders, the adequacy of the applications therefor, and the manner in which the orders were executed.

Before discussing the several arguments raised by the defendants, certain preliminary points should be noted.

Title III represents the first comprehensive federal legislation in the area of wiretapping and electronic surveillance.[3]

In passing this comprehensive legislation, Congress attempted to establish a limited system of wire surveillance and electronic eavesdropping within the framework of the Fourth Amendment and the guidelines laid down by the Supreme Court.[4] Congress plainly recognized the dangers inherent in the interception of wire and oral communications,[5] and, consequently, its essential purpose was to carefully delineate a uniform but limited set of circumstances and conditions under which the interception of wire and oral communications may be authorized, while establishing an elaborate set of safeguards to deter abuse and to expunge its effects in the event it should occur.[6] It is with an awareness of this Congressional purpose,[7] as well as an abhorrence of the misuse of electronic surveillance in our free society, that this court considers defendants' arguments.

2. The orders of this court which are the subject of the defendants' challenge are the following: order of November 24, 1970, authorizing the interception of oral communications at 2264 Bath Avenue; order of December 15, 1970, authorizing the continued interception of oral communications at 2264 Bath Avenue; order of December 8, 1970, authorizing the interception of wire communications from two telephones (212–372–9121 and 212–946–5009); and orders of December 23, 1970 and January 11, 1971, authorizing the continued interception of wire communications from the aforementioned telephones.

3. Title III supercedes section 605 of the Federal Communications Act of 1934, 48 Stat. 1103 (1934), as amended, 47 U.S.C. § 605. For discussions of the cases decided under section 605 and the Fourth Amendment, see Note, Wiretapping and Electronic Surveillance—Title III of the Crime Control Act of 1968. 23 Rutgers L. Rev. 319 (1969).

4. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Berger v. New York, 388 U.S. 41, 87 S. Ct. 1873, 18 L.Ed.2d 1040 (1967); Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

5. The language of the statute as well as the statement of Congressional findings and legislative history are replete with indications of Congress's concern with these dangers. See S.Rep.No.1097, 90th Cong.. 2d Sess., U.S.Code Cong. & Admin. News at p. 2156 (1968) (hereinafter cited as S.Rep.No.1097); Pub.L. 90–351, Title III, § 801, June 19, 1968, 82 Stat. 112. (Congressional findings).

6. S.Rep.No.1097 at pp. 2112, 2153; cf. In re Evans, 452 F.2d 1239, 1243 (D.C. Cir. 1971), petition for cert. filed sub nom., United States v. Evans, 40 U.S. L.W. 3091 (U.S. Aug. 20, 1971).

7. Despite Congressional caution in balancing conflicting interests, Title III has been severely criticized in several quarters. See Linzer, Federal Procedure for Court Ordered Electronic Surveillance: Does it Meet the Standards of Berger and Katz?, 60 J.Crim.L.C. & P.S. 203 (1969); Spritzer, Electronic Surveillance by Leave of the Magistrate: The Case in Opposition, 118 U.Pa.L.Rev. 169 (1969); Schwartz, The Legitimation of Electronic Eavesdropping: The Politics of "Law and Order", 67 Mich.L.Rev. 455 (1969); Note, Wiretapping and Electronic Surveillance—Title III of the Crime Control Act of 1968, 23 Rutgers L.Rev. 319 (1969); Note, 3 Valparaiso U.L.Rev. 89 (1968).

It should also be noted that Congress has authorized certain procedures for moving to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom.[8] Thus, the defendants move not only pursuant to Rule 41(e), Fed.R.Crim.P., but also pursuant to 18 U.S.C. § 2518(10);[9] the Government's response is made pursuant to 18 U.S.C. § 3504(a).[10]

(1) Defendants challenge the sufficiency of the probable cause on which the issuance of this court's first order authorizing electronic surveillance was founded and the existence of fresh probable cause for the subsequent orders. No further arguments are raised to develop their allegations.

■■ The absence of probable cause for an order authorizing electronic surveillance would violate both the Fourth Amendment and Title III.[11] United States v. Leta, 332 F.Supp. 1357, 1361 (M.D.Pa.1971). Whether such probable cause existed is to be determined by the contents of the application for the order and the affidavits in support thereof. United States v. Roth, 391 F.2d 507 (7th Cir. 1967). In considering the sufficiency of the supporting evidence, certain principles must be kept in mind.[12] The judge before whom a Title III application is made must act as a neutral and detached magistrate,[13] drawing inferences from the evidence presented[14] and independently assessing the probability

8. For general discussions of these procedures and certain problems incident thereto, see In re Evans, 452 F.2d 1239 (D.C. Cir. 1971) ; United States v. Doe, 451 F. 2d 466 (1st Cir. 1971) ; In re Egan, 450 F.2d 199 (3d Cir.) (en banc), cert. granted sub nom., United States v. Egan, 404 U.S. 990, 92 S.Ct. 531, 30 L.Ed.2d 541 (1971) ; In re Ellsberg, 446 F.2d 954 (1st Cir. 1971).

9. 18 U.S.C. § 2518(10) provides in pertinent part:

"(a) Any aggrieved person in any trial, . . . in or before any court . . . may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted ;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face ; or

(iii) the interception was not made in conformity with the order of authorization or approval."

10. 18 U.S.C. § 3504(a) provides in pertinent part:

"In any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United States—

(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny

the occurrence of the alleged unlawful act. . . . "

11. The relevant section of Title III, 18 U.S.C. § 2518(3), reads in pertinent part:

"Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting, if the judge determines on the basis of the facts submitted by the applicant that—

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter ;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception ;

 * * * * *

(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person."

12. See generally United States v. Scott, 331 F.Supp. 233, 243–244 (D.D.C.1971).

13. Giordenello v. United States, 357 U.S. 480, 487, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1957).

14. Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

that the facts were as alleged in the affidavit.[15] Probable cause may be found "upon evidence which is not legally competent in a criminal trial." [16] Where authorities, in applying for a warrant, rely completely on information furnished by an informant, there must be sufficient disclosure of the underlying circumstances from which the informant concluded that the suspect was engaged in criminal conduct and from which the authorities concluded the information was reliable. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Where the informant's information is corroborated by other information, it must be shown that the information disclosed by the informant is at least as trustworthy as the informer's tip would need be to stand alone under Aguilar. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).[17]

Several recent cases have dealt with the issue of probable cause under Title III and the Fourth Amendment and this court takes guidance from the principles enunciated therein.[18]

Applications for the initial and extension orders were made by Special Attorney Joseph F. Lynch; they were supported by affidavits of John C. McGinley, a Special Agent of the Federal Bureau of Investigation. The initial affidavit contains information gathered by Agent McGinley and other agents under his supervision, information obtained from two confidential informants, and information contained in the records of the New York City Police Department. The subsequent affidavits reiterate the statements contained in the initial affidavit; they also contain relevant information obtained pursuant to the prior court ordered surveillances after reports were filed with this court in accordance with the terms of the said orders.

■■ The fruits of Government surveillance are highly relevant to the issue of probable cause,[19] and, in this case, they clearly lead to an inference that a gambling business was being carried on by the defendants and others in violation of the New York State Law, and 18 U.S. C. § 1955, and 18 U.S.C. § 371 and that communications pertaining to such illegal conduct could be intercepted at the subject premises. Agent McGinley specifically averred that he [20] and other agents had, among other things, made the following observations: many exchanges of envelopes in or near the subject premises among the defendants and other persons, a minimum of 15 people per day double and triple parking in front of the premises and entering and remaining therein for 2 to 5 minutes, each of the named defendants closing the premises on various days at 4:30 P.M., defendant Joseph Candarini leaving the premises with a brown paper bag, no merchandise visible in the premises, and no activity consistent with the operation

15. United States v. Becker, 334 F.Supp. 546, 549 (S.D.N.Y.1971), aff'd, 461 F.2d 230 (2d Cir., filed May 30, 1972).

16. United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

17. *See also* United States v. Singleton, 439 F.2d 381 (3d Cir. 1971); United States v. Cantor, 328 F.Supp. 561, 566–567 (E. D.Pa.1971).

18. United States v. Poeta, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337, 455 F.2d 117, 121–122 (2d Cir. 1972), cert. denied; United States v. Kleve, 337 F.Supp. 557 (D.Minn.1971); United States v. La Gorga, 336 F.Supp. 190, 193 (W.D.Pa.1971); United States v. King, 335 F.Supp. 523, 532–537 (S.D.Cal.1971); United States v. Becker, 334 F.Supp. 546, 549–550 (S.

D.N.Y.1971); United States v. Leta, 332 F.Supp. 1357, 1361–1362 (M.D.Pa.1971); United States v. Scott, 331 F.Supp. 233, 242–244 (D.D.C.1971); United States v. Cantor, 328 F.Supp. 561, 565–568 (E.D. Pa.1971); Dudley v. United States, 320 F.Supp. 456, 458–460 (N.D.Ga.1970); United States v. Escandar, 319 F.Supp. 295, 304 (S.D.Fla.1970).

19. United States v. La Gorga, 336 F.Supp. 190, 193 (W.D.Pa.1971); United States v. Becker, 334 F.Supp. 546, 549–550 (S.D. N.Y.1971); United States v. Cantor, 328 F.Supp. 561, 565–568 (E.D.Pa.1971).

20. McGinley stated that he had experience in the investigation of gambling offenses and that he was familiar with the operation of gambling enterprises. McGinley Affidavit (November 24, 1970) at 2.

of a legitimate enterprise.[21] Independent investigation indicated Peter Candarini had previously been arrested for bookmaking; defendant Mainello had four gambling convictions.[22] Records of the New York Telephone Company also disclosed that bills for a telephone at the premises had been sent to defendant Joseph Candarini.[23]

The information furnished by the two informants is most pertinent.[24] Their tips clearly implicate the defendants and others, namely Albert DeCicco, John Coiro, and Sam Weiss, in the suspected gambling enterprise, and they indicate that incriminating communications could be intercepted at the subject premises. Moreover, there is a clear showing of the facts upon which the informants based their information [25] and also a showing by Agent McGinley of facts underlying his conclusion that the informants were reliable and credible. Each informant had personal knowledge of the facts to which he averred. The first informant had provided at least twenty-five items

of verified information on prior occasions, including information that assisted in another federal indictment and two arrests for federal gambling violations.[26] The second informant had similarly been reliable, having furnished information to federal authorities on seven prior occasions and having provided the New York City Police Department with information which led to the arrest of twenty-five persons for local gambling violations.[27] Moreover, the information which they offered was corroborated to some degree by the independent investigation of the federal authorities.[28]

Finally, it should be noted that before the orders were issued, this court, cognizant of the evils which unchecked electronic surveillance generate, personally questioned the applicant for the orders and his supporting affiant. The orders were not granted in a willy-nilly exercise of power but rather after a thorough investigation had indicated that probable cause did indeed exist.[29]

21. McGinley Affidavit (November 24, 1970) at 5–7. It might be argued that the information gathered by agents other than McGinley himself should not have been considered since it amounted to hearsay. Such an argument would be without merit in this case since the information was from reliable sources and was corroborated. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Dudley v. United States, 320 F.Supp. 456 (N.D.Ga.1970).

It should also be noted that throughout this opinion, for the purpose of brevity, only the November 24 affidavit of Agent McGinley will be referred to. Each of the subsequent supporting affidavits contains the identical averments, as well as supplemental averments derived from the court authorized surveillances.

22. McGinley Affidavit (November 24, 1970) at 7.

23. Id.,

24. Informant information is often essential in obtaining wiretap orders. See United States v. King, 335 F.Supp. 523 (S.D. Cal.1971); United States v. Becker, 334 F.Supp. 546 (S.D.N.Y.1971); United States v. Leta, 332 F.Supp. 1357 (M.D. Pa.1971); United States v. Scott, 331 F.Supp. 233 (D.D.C.1971); United

States v. Cantor, 328 F.Supp. 561 (E.D. Pa.1971); United States v. Escandar, 319 F.Supp. 295 (S.D.Fla.1970).

25. McGinley Affidavit (November 24, 1970) at 3–5. Facts and circumstances are carefully related to support the informants' conclusions that the defendants were illegally occupied at the subject premises. See Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

26. McGinley Affidavit (November 24, 1970) at 3.

27. Id.

28. Id. at 5–7.

29. Defendants also maintain that this court's authorizations were invalid because the Government did not have reasonable grounds for believing participation in the suspected gambling business on the part of their three alleged cohorts, DeCicco, Coiro, and Weiss, two of whom are not defendants, but all of whom were named in the orders. (Weiss is named as a defendant and pleaded guilty to Count two of the indictment). The various applications and affidavits contain a reasonable basis for a finding of probable cause that the three did so participate and that relevant communications involv-

Thus, on review, this court finds nothing to indicate that its prior determinations of probable cause were erroneous. There can be no doubt that there existed probable cause to believe that the three named defendants and others, including Albert DeCicco, John Coiro, and Sam Weiss (a named defendant), had violated and were violating 18 U.S.C. § 1955 and 18 U.S.C. § 371; that conversations pertaining to their illegal activity could be obtained through electronic surveillance; and that the subject premises and the telephones located thereat were commonly used by the defendants, their three so-called suspected cohorts and others in connection with their illegal activity.[30] Therefore, the principles laid down in this area by the Supreme Court were adhered to and the mandates of the Fourth Amendment and Title III were not offended.

(2) Defendants maintain that the conversations to be intercepted were not described in either the applications or the orders with sufficient particularity to satisfy the Fourth Amendment. Analysis of the provisions of the orders and the contents of the applications reveals that the defendants' argument is without merit.

■ In enacting Title III, Congress intended to incorporate the Fourth Amendment particularity requirements as laid down by the Supreme Court in Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).[31] In Berger, the Supreme Court struck down as deficient on its face a New York wiretap statute which did not require "particularity in the warrant as to what

specific crime has been or is being committed . . . 'the place to be searched' . . . [and] 'the persons or things to be seized.' " [32] Defendants' argument relates only to particularity of the "thing to be seized." In that regard, 18 U.S.C. § 2518(1) (b) (iii) requires that the application contain "a particular description of the type of communication sought to be intercepted"; 18 U.S.C. § 2518(4) similarly provides that the order shall specify:

"(a) the identity of the person, if known, whose communications are to be intercepted;

(b) the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;

(c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates." [33]

■ A pragmatic approach must be taken in determining whether the description requirements have been met. In disposing of an argument similar to the present one in United States v. Sklaroff, 323 F.Supp. 296, 307 (S.D. Fla.1971), the court stated that it was not required that:

" . . . the specific content of the anticipated conversations [be described]. It would be virtually impossible for the applicant for the order to predict in advance the exact language of a conversation which has not yet occurred. To impose such an absolute requirement upon an appli-

---

ing them could be intercepted at the subject premises which they commonly used. They finally contend that no informants could have supplied the information contained in the supporting papers. An affidavit of defendant Mainello specifically contests various of the essential informant averments in the supporting papers. As this court has already determined, however, the information which was based on the personal experiences of the reliable informants was corroborated and adequately supported a finding of probable cause.

30. *Compare* United States v. Kleve, 337 F.Supp. 557 (D.Minn.1971).

31. S.Rep.No.1097 at 2161.

32. 388 U.S. at 55–56, 87 S.Ct. at 1882.

33. It is clear that these provisions pass constitutional muster. United States v. Cox, 449 F.2d 679, 687 (10th Cir. 1971); United States v. Scott, 331 F.Supp. 233, 240–241 (D.D.C.1971); United States v. Perillo, 333 F.Supp. 914, 919–921 (D.Del. 1971).

cant would render Title III totally ineffective, because if the applicant guessed wrong on the exact predicted language, the evidence of the conversation would be inadmissible, even though it related to the crime under investigation."

█ In the case at bar, each of the applications specified that oral or wire communications of the defendants and others at 2264 Bath Avenue

" . . . concerning offenses enumerated in Section 1955 of Title 18, United States Code, that is, offenses in violation of Article 225, Sections 225.0 [225.00] through 225.40, New York State Revised Penal Law, [McKinney's Consol.Laws, c. 40], which have been committed and are being committed . . . "[34]

by the defendants and others were sought to be intercepted. The orders specified that oral and wire communications of· the defendants at 2264 Bath Avenue pertaining to the above mentioned gambling offenses were authorized to be intercepted. Moreover, both the orders and the applications in parts pertinent to probable cause more particularly described the conversations to be intercepted. It is therefore clear that the particularity requirements of the Fourth Amendment and Title III have been complied with. *See* United States v. Perillo, 333 F.Supp. 914 (D.Del.1971); United States v. Scott, 331 F.Supp. 233 (D.D.C.1971); United States v. Vega, 52 F.R.D. 503 (E.D.N.Y.1971).

██ (3) It is argued that the orders judicially sanctioned a continuing general search extending for an intolerable period of time. Berger v. New York, *supra*, and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) are cited in support of the argument. The *Katz* case did not involve the duration issue, and, therefore, it need not be considered.[35] *Berger* is on point, however, in that therein the Supreme Court clearly disapproved of a New York statute which allowed electronic surveillance for a period of two months without continuing judicial supervision or a requirement that probable cause be reestablished after some shorter period of time.[36] The framers of Title III clearly articulated their intention that, in accordance with the demands of *Berger*, the warrant under which the interception is authorized must limit that interception in scope and duration to the specific purpose of establishing the contents of the particular criminal conversations to which it is directed.[37] Thus, the time provisions under Title III were formulated with great caution. Title 18 U.S.C. § 2518(1) (d) requires an applicant to specify the period of time for which the interception is required to be maintained; § 2518(4) (e) requires that the authorizing order specify the period of time during which the interception is authorized, including a statement of whether the interception shall automatically terminate upon receipt of the described communications; and § 2518 (5) states in part:

"No order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days. Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section. The period of extension shall be no longer than the authoriz-

---

34. Article 225 of the New York State Penal Law contains the State's laws pertaining to gambling.

35. The *Katz* decision pertained to the "premises" and involved an argument that a telephone booth was a constitutionally protected area.

36. 388 U.S. at 59, 87 S.Ct. 1873, 18 L.Ed. 2d 1040.

37. S.Rep.No.1097 at 2190; *cf.* United States v. Escandar, 319 F.Supp. 295, 299–300 (S.D.Fla.1970).

ing judge deems necessary to achieve the purposes for which it was granted and in no event for longer than thirty days."

The record in this case indicates that applications, orders, and extensions were made in strict conformity with the statutes. Since the duration provisions clearly pass constitutional muster under *Berger*,[38] there is no merit to the defendants' argument that this court judicially sanctioned an impermissible search. Moreover, it should be noted that not only was probable cause required to be re-established on each application for extension [39] but this court continually supervised the authorized electronic surveillance.[40] Finally, the evidence indicates that the surveillances were conducted from November 25, 1970, to January 23, 1971, inclusive, with the exceptions of December 9, 1970, December 10, 1970, and every Sunday within that period of time.[41] This amounts to a total of 50 days—certainly not an intolerable period for the investigation of an illegal business operation of the magnitude which the evidence discloses the case at bar to involve.

 (4) Defendants next raise the issues of whether the various supporting papers filed by the Government contain

"a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous"

as required in 18 U.S.C. § 2518(1) (c) and whether the finding of this court pursuant to § 2518(3) (c) that § 2518(1) (c) was complied with is erroneous. The defendants contend in the alternative that if the required statement was filed, it involved misrepresentations on the part of the Government. They also maintain that under the facts and circumstances of this case, the alleged probable cause supporting the wiretap orders was sufficient probable cause for the arrest of the defendants and a search of the subject premises, and therefore the orders were unnecessary.

Each of the orders contains the specific finding that "normal investigative procedures reasonably appear to be unlikely to succeed and are too dangerous." The affidavits supporting the applications contain ample statements of fact upon which such a finding could be made. The initial affidavit of Agent McGinley relates that the confidential informants had refused to give testimony at any proceeding, that physical surveillance of the subject premises or any other location where the suspected criminal conduct might be engaged in would offer scant likelihood of obtaining satisfactory evidence because of the suspicion with which the suspected parties regard strangers, and that prior law enforcement experience indicates that gambling raids and other such searches have not resulted in the gathering of evidence sufficient to prove all elements of the suspected offense.[42] The subsequent affidavits specify that although the prior ordered surveillances did result in the

---

38. *See* United States v. Perillo, 333 F. Supp. 914, 922 (D.Del.1971); United States v. Leta, 332 F.Supp. 1357, 1360–1361 (M.D.Pa.1971); United States v. Escandar, 319 F.Supp. 295, 299–300 (S.D. Fla.1970); *cf.* Advisory Committee on the Police Function, American Bar Association Project on Minimum Standards for Criminal Justice (1968).

39. *See* discussion of probable cause, *supra*, at pp. 7–16.

40. Each order was issued with the § 2518 (6) proviso that Special Attorney Joseph F. Lynch, the applicant,

"shall provide the court with a report on the fifth and tenth days following the date of this order showing what progress has been made toward achievement of the authorized objective and the need for continued interception."

These conditions were properly complied with by Mr. Lynch.

41. Government Exhibit No. 9 at 2.

42. McGinley Affidavit (November 24, 1970) at 7–8.

identification of certain persons as members of the suspected gambling ring, the evidence was not adequate to fully implicate those parties mentioned and extended interception was necessary to more fully develop the scope and nature of the participation of the suspected parties.

Three cases have been decided on issues similar to those now raised by the defendants. United States v. King, 335 F.Supp. 523 (S.D.Cal.1971); United States v. Leta, 332 F.Supp. 1357 (M.D. Pa.1971); United States v. Escandar, 319 F.Supp. 295 (S.D.Fla.1970). The *King* and *Escandar* cases indicate that no specific statement of facts and circumstances is required in an order to support a § 2518(3) (c) finding [43] and that where a case involves the investigation of a large scale conspiracy, as it does here, the difficulty of procuring reliable evidence through conventional investigative channels is self-evident.[44] The *King* case involved an argument that the wiretap order was unnecessary since arrest could have been made without the authorized electronic surveillance. The court found no merit in the argument and determined that the need for the order was shown by averments in supporting affidavits similar to but not as far-reaching as those in the case at bar.[45]

On the basis of the above principles and the facts and circumstances of this case, it can only be concluded that the arguments raised by the defendants are without foundation and that (a) a full and complete statement as required by § 2518(1) (c) is contained in the supporting affidavits of Agent McGinley; (b) this court's § 2518(3) (c) finding is well justified in light of the McGinley's averments and the large scale conspiratorial nature of the conduct being investigated; (c) the evidence possessed at the time of the applications for the orders would not present sufficient probable cause for the arrest of the defendants; nor would the search incident to arrest produce evidence sufficient to warrant a conviction, and, therefore, the desired electronic surveillance was essential; and (d) the unsupported allegations of government misrepresentation are baseless especially in light of the presence of circumstances tending to corroborate their averments and the results of this court's independent questioning of Agent McGinley and Special Attorney Lynch.[46]

(5) Defendants maintain that the manner in which the electronic surveillance was administered resulted in the recording of a mass of irrelevant conversations violating Title III provisions and Fourth Amendment safeguards.[47]

---

43. 319 F.Supp. at 304.

44. 335 F.Supp. at 535; 319 F.Supp. at 304.

45. The following averments were determined to justify the court's § 2518(3) (c) finding:
"Normal investigative procedures will not result in government agents keeping abreast of the movements of the vessel Mercy Wiggins or in securing information as to the pickup and transportation of marijuana by that vessel between Mexico and this country. There is no way in which government agents can conduct a surveillance of the movements of that vessel during a lengthy voyage to Mexico and back to this country without detection by the subjects under surveillance, nor is there any way of learning where and when that vessel will arrive in this country

with marijuana except by the proposed electronic surveillance." (335 F.Supp. at 535).

46. The unsupported allegations are insufficient to warrant a hearing. Cohen v. United States, 378 F.2d 751, 760 (9th Cir. 1967); United States v. Stonehill, 254 F.Supp. 1003, 1005 (S.D.N.Y.1966).

47. *See* Berger v. New York, 388 U.S. 41, 59, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). The relevant Title III provision, 18 U. S.C. § 2518(5), provides in pertinent part:
"Every order . . . shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception . . . . ."

They cite four cases to support their contention, Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); United States ex rel. Nickens v. LaValle, 391 F.2d 123 (2d Cir. 1968); United States v. Dzialak, 441 F.2d 212 (2d Cir. 1971), cert. denied, 404 U.S. 883, 92 S.Ct. 218, 30 L.Ed.2d 165; United States v. Scott, *supra,* and they urge the court to suppress all material electronically seized.

In *Marron,* a prohibition agent had obtained a search warrant particularly describing the things to be seized—intoxicating liquors and articles for their manufacture. In carrying out the search, however, agents also seized a ledger and certain bills. The Supreme Court, noting the Fourth Amendment's ban on general searches, found that the seizure of the latter items was not authorized by the warrant and that they could not be admitted on that basis. Significantly, however, the articles were admitted on the ground that they were legally seized incident to an arrest. Moreover, no argument was raised, nor finding made, as to the suppression of the liquors validly seized under the warrant.

The *Nickens* case involved a warrant to search for certain key making paraphernalia suspected of being used in a series of burglaries. During the search, newspaper clippings which contained accounts of the burglaries were seized. The Court of Appeals, Second Circuit, citing *Marron, supra,* found that the seizure of the clippings was not authorized by the warrant; nor was it made incident to arrest. Petitioner's conviction was vacated since the introduction of the clippings into evidence was not harmless error. Once again, it should be noted that no issue as to the validity of the seizure of the materials described in the warrant was involved.

In the more recent Second Circuit case, United States v. Dzialak, *supra,* a search of the defendant's premises produced a

number of watches not specified in the search warrant. On the basis of *Marron* and *Nickens, supra,* the court reversed defendant's conviction for the count of unlawful possession of the watches which were determined to have been illegally seized. Defendant's contention that he was prejudiced in his defense on the other counts of unlawful possession by the introduction of the illegally seized evidence was specifically rejected. There existed ample evidence independent of that illegally seized to convict the defendant. Moreover, nothing was presented to indicate that the admission of the illegal evidence affected the jury's verdict as to the other counts.

The final case cited by defendants, United States v. Scott, is most similar to the instant case. Defendants were indicted for various narcotics violations primarily on the basis of evidence obtained pursuant to a Title III order, which unequivocally mandated that only conversations relating to narcotics be overheard and recorded. Despite the order, all conversations, sixty percent of which did not pertain to narcotics, were overheard and recorded. Noting the complete disregard of the authorizing order by the surveilling agents and their defiance of the protections to the right to privacy outlined in *Berger* and *Katz,* the court suppressed all communications obtained pursuant to the Title III authorization. No cases were cited by the court to support its determination.

This court's research has disclosed several recent cases, which, although precisely on point, were not mentioned by the defense. These cases indicate that those relied upon by the defense are distinguishable from the case at bar and that the defense argument lacks any merit.

In United States v. King, 335 F.Supp. 523 (S.D.Cal.1971), after having obtained a Title III order, surveillance agents proceeded to intercept communications on

This provision clearly complies with constitutional safeguards. United States v. Scott, 331 F.Supp. 233, 246 (D.D.C.

1971); United States v. King, 335 F. Supp. 523, 538 (S.D.Cal.1971).

a 24-hour basis for a period of 45 days. The court determined that as a matter of fact much of the material intercepted was not relevant to the investigation and that the Government's attempts to comply with the minimization provisions of the orders and statute were unsatisfactory. The court refused to suppress all the electronically seized evidence, however, and it stated:

"While this Court agrees with *Scott* that indiscriminates interception by Government agents is an invasion of privacy not to be tolerated, it is not clear that the application of the exclusionary rule to the wire surveillance requires complete suppression. While it is true in this case that a substantial portion of the 1556-page wiretap transcript represents unauthorized interceptions, it must be emphasized that the rest was monitored and recorded by Customs agents in compliance both with the statute and the authorizing order.

\* \* \* \* \* \*

This Court takes issue with [the *Scott*] position as having no legal basis, preferring to consider wiretaps within the framework of the general law of search and seizure and to follow its principles. (Citations omitted).

Throughout its history, whenever application of the exclusionary rule has resulted in total suppression of evidence in a criminal prosecution, it has been because the entire search and seizure was considered tainted by some violation of Fourth Amendment rights. (Citations omitted).

This was the case even in Berger v. New York, *supra,* and Katz v. United States, *supra,* the two decisions having the most significance in the genesis of constitutionally-approved electronic surveillance. In *Berger* the New York statute which authorized the electronic eavesdrop was adjudged unconstitutional so that no search pursuant to that statute could be valid either in whole or in part. Likewise in *Katz* an otherwise validly executed "bug" was considered a violation of the Fourth Amendment because not authorized by a judge. The entire search was void *ab initio*.

The case presently before this Court is of a different nature. Here we have a constitutional statute and a valid warrant (authorizing order) issued thereunder. In its execution, however, some, but not all, of the evidence seized lay beyond the scope of the warrant." (335 F.Supp. at 543–544).

Citing *Marron* and *Nickens, supra,* and other relevant cases, the court concluded that:

" . . . Rule [41(e), Fed.R.Crim. P.] provides that if '*the property* seized is not that described in the warrant,' then 'the property shall be restored unless otherwise subject to lawful detention and it shall not be admissible in evidence at any hearing or trial.' (Emphasis added.) This language would seem to require an item-by-item consideration of the warrant and the items seized during the search pursuant thereto. With the exception of *Scott,* defense counsel has cited us to no contrary opinion, nor could our own research discover any. Combined with the above-quoted language of Rule 41(e), this indicates to the Court that in the ordinary case, the seizure of some items of evidence in excess of those specified in a search warrant does not result in the suppression of those items which were validly seized." (335 F.Supp. at 544–545).

The court in United States v. Leta, 332 F.Supp. 1357 (M.D.Pa.1971), also refused to suppress all electronically seized evidence although much evidence was indiscriminately seized without regard to its connection to the suspected criminal conduct.[48] The court went so far as to

---

48. The court stated:
"Preliminarily, it should be noted that the seizure of items which have not been particularly described does not per se vitiate the entire search; the entire search is vitiated only if it is unreason-

note that the continuous seizure of a defendant's conversations conducted in accordance with § 2518(5) might in fact protect the defendant from having the conversations edited to his detriment or taken out of context. (332 F.Supp. at 1360). See also United States v. La Gorga, 336 F.Supp. 190 (W.D.Pa.1971), wherein the court dismissed an argument identical to that presently raised.[49]

This court finds the reasoning of the *King, Leta,* and *LaGorga* cases most compelling and it entertains grave doubts as to the propriety of the *Scott* decision. Moreover, the *Marron, Nickens,* and *Dzialak* cases, which the defense relies upon, are in fact contrary to the position the defense urges this court to take. They clearly hold that where, in execution of a valid search warrant, material beyond the scope of the warrant is illegally seized, the material validly seized is not tainted and it is properly admissible. Therefore, on the basis of the above decisions, this court suppresses all evidence obtained by electronic surveillance which does not pertain to the offenses of which the defendants were suspected at the time of the issuance of the orders and which were specifically mentioned in the orders.[50] However, those conversations described in the orders were properly transcribed and will be given due consideration by the court.

(6) Section 2516(1) of Title 18, U.S.C., provides in pertinent part:

"The Attorney General, or any Assistant Attorney General specifically designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for . . . an order authorizing or approving the interception of wire or oral communications. . . ."

Relying upon the case of United States v. Robinson, No. 71–1058 (5th Cir., filed

---

able . . . [I]f the defendant wishes to object to the introduction in evidence of the particularly described items, he must show that the seizure of the undescribed items or other misconduct in the search makes the entire search unreasonable." (332 F.Supp. at 1360).

49. The court stated:
"It is often impossible to determine that a particular telephone conversation would be irrelevant and harmless until it has been terminated. It is certainly not unusual for two individuals using the telephone to discuss social matters or items of general interest before getting to the precise point which is to be covered in the call.

\* \* \* \* \*

That such problems would be encountered in surveillance was certainly not unknown to Congress which discussed the matter on many occasions. We cannot ignore the fact that in spite of this possibility, the Act was passed although it did incorporate a requirement that the Court Order minimize the interception of communications not otherwise subject to interception (18 U.S.C. § 2518(5)).

\* \* \* \* \*

Our case is somewhat different from that of United States v. Scott, supra, where the agents admittedly made no attempt at all to minimize the interception of irrelevant calls. While the Court ordered the evidence suppressed in that case, we feel that the factual situation here is distinguishable and requires a different result. We also entertain serious doubts that suppression of all the evidence is mandated as the decision in *Scott* seems to indicate. Rather we choose to accept the interpretation of § 2518(10) (a) adopted by the Court in United States v. King, 335 F.Supp. 523 (S.D.Calif.1971).

\* \* \* \* \*

It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated. However, the monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take. It is also true that, during the early part of the surveillance, it was necessary for the agents to familiarize themselves with the voices of those who were working with the defendants." (336 F.Supp. at 196).

50. Although the total mass of recorded material includes much that is irrelevant, the fruits of the Government's surveillance which are now before the court—the material included in Government Exhibit No. 1—deal almost entirely with the offenses with which the defendants are charged.

Jan. 12, 1972),[51] the defendants argue that the Government has failed to comply with this statutory mandate.

In light of two recent Second Circuit cases, United States v. Pisacano, 459 F. 2d 259, No. 72–1181 (filed April 7, 1972), petition for cert. filed, 40 U.S.L.W. 3528 (U.S. Apr. 20, 1972), and United States v. Becker, 461 F.2d 230, No. 72–1105 (filed May 30, 1972), and in light of the facts in the case at bar, it is the conclusion of this court that *Robinson* is inapplicable and the electronically seized evidence is not to be suppressed because of the allegedly improper procedures followed in obtaining the necessary authorizations.

In *Robinson*, affidavits indicated that Sol Lindenbaum, Executive Assistant to the Attorney General, had approved actions designating Will Wilson, then Assistant Attorney General in charge of the Criminal Division, to authorize designated officials to apply to a federal judge for Title III orders, and that Henry Petersen, Wilson's then Deputy Assistant, had signed Wilson's name in conformity with the standard Justice Department procedures of dispatching an authorization letter to local applicants. Noting Congressional intent in enacting § 2516(1) [52] to fix responsibility on identifiable persons who seek Title III orders, the court ruled that, despite the general power of the Attorney General

to delegate authority pursuant to 28 U.S.C. § 510, the statute had not been complied with and its purpose had been subverted by what was considered a routine method of handling authorizations. The court reversed convictions that had been obtained on the basis of evidence procured through Title III wiretaps.[53]

■ The Government has filed a series of supplemental affidavits and memoranda detailing the procedures followed in obtaining the challenged court orders.[54] They present the following factual picture.

The formal requests for authorizations to apply for the interceptions of wire and oral communications in this case were made by Special Attorney Joseph F. Lynch.[55] When these requests were received, the Justice Department's working file, in each instance consisting of copies of the proposed affidavit, application and order, was received in a special unit of the Organized Crime and Racketeering Section by attorneys whose primary function was to review such matters for form and substance, with particular emphasis on assuring strict adherence to the required statutory, judicial, and constitutional standards.[56] After review of the file and recommendation of favorable action on the request by the Section's staff and its Deputy Chief, the file was forwarded to Henry E.

---

51. The Government advises that the *Robinson* case has been reconsidered by the Court of Appeals, Fifth Circuit, sitting en banc. The case is presently awaiting their decision.

52. S.Rep.No.1097 at pp. 2112, 2185.

53. *Accord*, United States v. Aquino, 338 F.Supp. 1080 (E.D.Mich.1972); United States v. Baldassari, 338 F.Supp. 904 (M.D.Pa.1972); United States v. Cihal, 336 F.Supp. 261 (W.D.Pa.1972), appeal docketed, No. 72–1201 (3d Cir. April 13, 1972); United States v. Casale, 341 F. Supp. 374 (M.D.Pa.1972); United States v. Focarile, 340 F.Supp. 1033 (D.Md. 1972).

54. These affidavits have been properly received by the court, especially since they do not bear upon the guilt or innocence

of the defendants, but pertain to matters of administrative procedure. Moreover, it is unnecessary and inappropriate to require direct oral testimony from the former Attorney General and other Justice Department personnel on a matter which can be clarified by means of affidavits. United States v. Pisacano, 459 F.2d 259, No. 72–1181 (2d Cir., filed April 7, 1972); United States v. Consiglio, 342 F.Supp. 556, Crim.No. H–24 (D.Conn., filed April 20, 1972); United States v. Gerodemos, No. 71 H CR 67(2) (N.D.Ind., filed February 14, 1972); United States v. Doolittle, 341 F.Supp. 163, Cr. No. 8815 (M.D.Ga., filed February 11, 1972).

55. Government Exhibits 17, 18, 19, 20, and 21.

56. Government Exhibit 22.

Petersen, then Deputy Assistant Attorney General of the Criminal Division.[57] Subsequent to Petersen's review and favorable recommendation, the file was sent to the Office of the Attorney General.[58] With regard to the requests dated November 20, December 7, and December 11, 1970, and January 8, 1971, the Attorney General personally reviewed and approved each.[59] He then personally initialled memoranda to Will Wilson reflecting his favorable action on the requests.

With regard to the request dated December 23, 1970, since the Attorney General was unavailable, his Executive Assistant, Sol Lindenbaum, approved the authorization for the application in accordance with the authority granted to him in such cases by the Attorney General and on the basis of his knowledge of the Attorney General's action on the three previous requests and in other cases.[60] Lindenbaum caused the Attorney General's initials to be affixed to the memorandum entitled "Extension of Interception Order Authorization."

Each of the five memoranda addressed to Will Wilson recited that he was "specially designated to authorize Joseph F. Lynch" to make the application.[61] Following this approval, the letter of authorization was forwarded to Lynch advising him that he was authorized to present the application to the court. In accordance with the authorization of Will Wilson and the standard procedures of the Criminal Division, Henry E. Petersen signed Wilson's name to the letter.[62]

The Government contends that although the memoranda to Wilson recited that he was specially designated to authorize the applications, these memoranda and the letters to Lynch were merely the procedure adopted for transmission of the authorization to the field. The discretionary action of approving the request to make the application was taken by the Attorney General in each instance except the one where Sol Lindenbaum acted in his place.

The facts are virtually identical to those in the *Piscano* and *Becker* cases, *supra*, and, therefore, this court can only adhere to the law of this Circuit as it was established in those two decisions. It was stated in *Pisacano*:

> "This recital [of the facts] suffices to show that the procedures here followed, even as to the July 30 request,[63] were, to say the least, a much closer approach to the desires of the Senate Committee [which considered Title III] . . . than what the Fifth Circuit [in *Robinson*] concluded from the affidavits submitted to it. The Attorney General assumed full responsibility for what was done even if he did not act himself in every case. From what now appears, the 'narrow limitation' on authorizations by 'top department officials' prescribed in § 2516(1) did result in the establishment of 'a unitary policy in the use of the awesome power conferred' in Title III—as the *Robinson* court concluded the intent of Congress No. 71–1058 (5th Cir. filed Jan. 12, 1972).

\* \* \* \* \* \*

Moreover, the procedures used clearly conformed with the letter of § 2516 (1), particularly when this is read in light of the evidence, furnished by § 101(a) of the Civil Rights Act of 1968, 18 U.S.C. § 245(a) (1), that when Congress wished to prohibit delegation of any sort, it knew how to do it. This

---

57. *Id.*

58. *Id.*

59. Government Exhibits 16, 17, 18, 19, and 21.

60. Government Exhibits 16 and 20.

61. Government Exhibits 17, 18, 19, 20, and 21.

62. Government Exhibits 22 and 24.

63. The July 30 request was initiated by Mr. Lindenbaum, the Executive Assistant to the Attorney General, who, as in the case at bar, affixed the Attorney General's initials thereto on the basis of his conclusion, stemming from his knowledge "of the Attorney General's actions on previous cases, that he would approve the request if submitted to him."

could well be 'a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute.' Greenwood v. United States, 350 U.S. 366, 374, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956) (Frankfurter, J.)" 459 F.2d at 263.[64] See also United States v. Cox, 462 F.2d 1293 (8th Cir., filed June 5, 1972).

In *Becker*, the court was faced with what it considered to be a factual situation identical to that in *Pisacano*. It stated:

" . . . [T]he panel in *Pisacano* concluded that although the procedure used by the Attorney General and his staff in authorizing the application to be made for one wiretap order (dated July 30, 1970) did not follow the literal reading of § 2516(1), *supra,* the Attorney General's delegation of authority to Mr. Lindenbaum rather to an Assistant Attorney General would not warrant reversal of a conviction obtained through use of wiretaps resulting from the court order thereby obtained. We feel bound to follow *Pisacano,* especially since it is so recent and the facts before the court there are indistinguishable. See, e. g., Tel-

lier v. CIR, 342 F.2d 690, 692 n. 3 (2d Cir. 1965) [cert. denied, 382 U.S. 817, 86 S.Ct. 38, 15 L.Ed.2d 63]; Mallory v. United States, [104 U.S.App. D.C. 71] 259 F.2d 801, 802 (1958); see generally A. Alexander, En Banc Hearings in the Federal Courts of Appeal: Accommodating Institutional Responsibilities, 40 N.Y.U.L.Rev. 562, 582 n. 120 (1965)".[65] (461 at 235–236).

Therefore, on the basis of the *Pisacano* and *Becker* decisions, as to the correctness of which this court entertains no doubts,[66] it must be concluded that the statutory requirements of Title III were complied with by the Government in seeking the court orders for electronic surveillance.[67]

(7) A number of other arguments are raised by the defendants in an attempt to suppress the electronically seized evidence. These can be disposed of summarily.

 It is alleged that electronic surveillance was conducted during the periods from December 8 through December 15, 1970, and from January 6 through January 11, 1971, without authorization and also that the authorized surveillance equipment was not dis-

---

64. The court also noted that while Will Wilson was identified as the authorizing officer when in fact the Attorney General or Mr. Lindenbaum had approved the applications, this discrepancy did not meaningfully subvert the Congressional scheme in protecting against Title III abuse. Responsibility was fixed on identifiable officials of the Justice Department. (459 F.2d at 264, note 5).

65. The court also stated that:
"Although the application to the court erroneously stated that it had been authorized by Wilson rather than by the Attorney General himself, we consider this to be harmless error." (461 at 235.)

66. Were it not for the recent Second Circuit decisions in this area, it might have been successfully argued that the December 23, 1970, application authorized by Lindenbaum was defective. Such a ruling and suppression of the evidence obtained pursuant and subsequent to the order based on the defective authorization

would not affect the guilt or innocence of the defendants herein. The case is conclusively established on the basis of the evidence obtained through the three orders prior to December 23.

67. *See also* United States v. Iannelli, 339 F.Supp. 171 (W.D.Pa.1972); United States v. Aquino, 336 F.Supp. 737 (E.D. Mich.1972) (original order); United States v. La Gorga, 336 F.Supp. 190 (W. D.Pa.1971); United States v. Consiglio, 342 F.Supp. 556, CR.No. H–24 (D.Conn., filed April 20, 1972); United States v. D'Amato, 340 F.Supp. 1020, CR.No. 71–266 (E.D.Pa., filed March 22, 1972); United States v. King, No. 11627–CR (S. D.Cal., filed March 6, 1972); United States v. Doolittle, 341 F.Supp. 163, CR.No. 8815 (M.D.Ga., filed February 11, 1972); United States v. Gerodemos, No. 71 H CR 67(2) (N.D.Ind., filed February 14, 1972); United States v. Green, 71–376 CR.C.A. (S.D.Fla.1971); United States v. Sklaroff, Crim.No. 26355 (N.D. Ga., filed Sept. 30, 1970).

mantled or removed during these periods. These arguments seem to be the product of pure conjecture: they are unsupported by any statement of facts and circumstances and are of dubious merit. The record clearly indicates that no evidence has been submitted which was intercepted during unauthorized periods.[68] In any event, the alleged invalid interceptions would not invalidate the prior and subsequent valid interceptions.[69]

■■■ Defendants also state that the papers supporting the extension applications fail to allege compliance with the conditions set forth in the prior orders. No basis for this argument has been furnished to this court and it is totally devoid of merit.

In summary, this court makes the following conclusions with regard to defendants' motion to suppress the electronically seized evidence: (a) the statutory provisions pursuant to which the applications and orders were made and executed are constitutional;[70] (b) the application procedures complied with the requirements of Title III and the Fourth Amendment; (c) the authorizing orders and extensions complied with Title III and the Fourth Amendment; and (d) the orders and extensions were executed in compliance with the requirements of Title III and the Fourth Amendment, except insofar as conversations not relating to the gambling offenses of which the defendants were suspected were intercepted. Therefore, this court orders suppressed all those conversations intercepted by means of electronic surveillance which did not relate to the gambling offenses of which the defendants were suspected and which were specified in the orders of this court; and it further determines that all other conversations contained in Government Ex-

hibit 1 which relate to the aforementioned offenses and which were intercepted pursuant to the authorizations of this court are properly admitted in evidence.

Defendants have filed three other pretrial motions which can also be determined in a summary fashion.

They move to suppress Government Exhibits 3 through 7 which contain documentary evidence damaging to the defendants. The evidence was seized on April 2, 1971, at 2264 Bath Avenue, Brooklyn, New York, by federal agents pursuant to a search warrant. It is asserted that there existed no probable cause upon which the warrant could have issued and, in the alternative, if probable cause did exist, it was the tainted product of an invalid electronic surveillance. As has been determined, *supra,* the electronic surveillance was validly authorized and executed and, therefore, the evidence supporting the warrant was not tainted.[71] It is also apparent that there was a sufficient showing of probable cause based upon untainted evidence to support the warrant.[72] Defendants' motion must therefore be denied.

■■■ Defendants also seek a hearing, without the presence of the defendants, at which hearing the informants relied upon for probable cause can be examined. It is well settled that the Government has a privilege of refusing to disclose the identity of its informants. McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Although the privilege is not an absolute one, in order to overcome it, the defendants must make a showing that disclosure is necessary to insure a fair trial or that other

---

68. Government Exhibits 1, 9, and 13.

69. *See* discussion in section (5) *supra.*

70. This court is aware of the recently filed opinion in the case of United States v. Whitaker, 343 F.Supp. 358 (E.D.Pa., filed May 31, 1972) (Lord, Ch. J.), wherein Title III was declared unconstitutional. Although the reasoning in that case is

respected, this court respectfully disagrees and is of the opinion that the great number of decisions upholding the validity of Title III were correctly decided.

71. *See* United States v. Iannelli, 339 F. Supp. 171, 180 (W.D.Pa.1972).

72. McGinley Affidavit (April 2, 1971).

882

judicially specified conditions are present.[73] United States v. Coke, 339 F.2d 183 (2d Cir. 1964). A mere request for disclosure is insufficient. United States v. Russ, 362 F.2d 843 (2d Cir. 1966), cert. denied, 385 U.S. 923, 87 S.Ct. 236, 17 L.Ed.2d 146. Defendants' motion is denied since they have failed to show how they might be prejudiced by the nondisclosure of the informants or how the interests of justice would be served by the granting of the desired hearing.

█ Finally, defendants request this court to decline consideration of the suppression issues in this case, since it was this court which issued the orders authorizing electronic surveillance. No persuasive arguments are present in the defendants' papers on this point, and since no valid purpose can be discerned with regard to the motion, the request is denied.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The statute under which the defendants were indicted, 18 U.S.C. § 1955, provides in pertinent part:

"(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) 'illegal gambling business' means a gambling business which—

(i) is a violation of the law of a a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, su-

pervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day."

The defense concedes, and it is readily apparent, that the Government's evidence establishes, beyond a reasonable doubt, that each of the defendants participated in illegal gambling activity in violation of the law of the State of New York and that such activity on the part of each defendant was substantially continuous for a period in excess of thirty days. With regard to the substantive and conspiratorial offenses with which the indictment charges the defendants under 18 U.S.C. §§ 371 and 1955, three arguments are raised, however.

█ The defendants first contend that the conspiracy count must be dismissed as a matter of law since both the conspiracy and substantive offenses consist of the same acts and in such a case the conspiracy charge may not be added to the substantive charge.[74]

The issue raised by the defendants has been resolved by the Court of Appeals, Second Circuit, in its recent decision in United States v. Becker, 461 F.2d 230, No. 72–1105 (filed May 30, 1972). That case also involved a two count indictment charging violation of 18 U.S.C. § 1955 and conspiracy to violate that section in contravention of 18 U.S.C. § 371. In rejecting the defendants' argument, the court stated:

"It is a fundamental principle, too settled to require explication, that 'the commission of the substantive offense

73. *See* Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) (informant was an essential participant in the offense); United States v. Franzese, 392 F.2d 954 (2d Cir. 1968), vacated on other grounds, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (testimony would be material to a substantial issue in the case); United States v. Simonetti, 326 F.2d 614 (2d Cir. 1964) (participation in the crime was a result of entrapment by the informant).

74. The defendants state:
"It is manifestly impossible to violate 18 U.S.C. § 1955 without conspiring with at least four other persons, 18 U. S.C. § 1955(b) (1) (ii). Hence, a person cannot be guilty of violating 18 U. S.C. 1955(a) and at the same time guilty of violating 18 U.S.C. 371, Gebardi v. U. S., 278 [287] U.S. 112 [53 S.Ct. 35, 77 L.Ed. 206] (1932)." (Defendants' Memorandum at 8).

and a conspiracy to commit it are separate and distinct offenses.' Callanan v. United States, 364 U.S. 587, 593 [81 S.Ct. 321, 325, 5 L.Ed.2d 312] (1961). As we have recently reiterated, as long as the conspiratorial concert of action and the substantive offense underlying it are not coterminous and fewer participants are required for the commission of the substantive offense than are named as joining in a conspiracy to commit it, there is no infirmity in the conspiracy indictment. United States v. Benter, 457 F.2d 1174, 1178 (2d Cir. 1972). Appellants do not suggest that the evidence was insufficient to support a verdict finding them guilty of participation in a seven-man conspiracy. Indeed all seven defendants stand convicted of the conspiracy charge. Upon the record before us, therefore, appellants' conviction of the conspiracy charge appears to be valid and must be affirmed." (*id.* at 234).[75]

This statement of the law is apposite and illustrates the invalidity of the defendants' argument.[76] Since the conspiracy charged involved agreement on the part of more participants [77] than were necessary for the commission of the substantive offense, the conspiracy count may stand.

■ The defendants next argue that nothing in the Government's proof supports a finding, beyond a reasonable doubt, that the three defendants participated in the same illegal gambling business. An examination of the evidence, especially Government Exhibit 1, clearly indicates, beyond a reasonable doubt, that the argument is frivolous and that the defendants and others were involved in a single business operation. The defendants and others often engaged in discussions pertaining to the operation of their joint enterprise. They also discussed the magnitude of their operation with several "customers" and co-conspirators in such a way as to indicate that they were referring to the gambling operation at 2264 Bath Avenue, Brooklyn, New York, which was conducted by the three defendants and others. Calls were also accepted indiscriminately by each of the three defendants at the premises and there is no indication that any of the defendants retained their own "clients." Finally, it would be most unusual for three independent bookmakers to be ensconced in the same cramped quarters day after day for months on end.[78] The evidence overwhelmingly supports the conclusion that the three defendants were involved in a single illegal business operation.

■ Finally, it is contended that the Government has failed to meet the requirement of 18 U.S.C. § 1955(b) (1) (ii) that there be at least five persons

---

75. *Contra*, United States v. Greenberg, 334 F.Supp. 1092 (N.D.Ohio 1971), wherein the court, in deciding the present issue, applied the so-called "Wharton's Rule", which is stated in Wharton, 2 Criminal Law § 1339, and which simply stated provides that when the actions of two or more people are necessary to the commission of a certain crime and that substantive crime has actually been committed, then that offense may not be indicted as a conspiracy. The court dismissed the conspiracy count against the defendants. It stated:

"One of the bases of federal intervention [into the area of regulation of organized gambling syndicates] is a concert of action between the parties. In other words, the [substantive] offense is one involving the element of

*concursus necessarius*. That is, it is absolutely necessary that there be a plurality of parties and it is necessary that there be concerted action among them. It therefore appears that a charge of conspiring to commit the offense should not be maintainable." (334 F.Supp. at 1095).

*But see*, United States v. Iannelli, 339 F.Supp. 171, 181–182 (W.D.Pa.1972).

76. *See also* United States v. Smolin, 182 F.2d 782 (2d Cir. 1950).

77. The conspiracy count charged a total of 31 persons. (Indictment No. 71–CR–401). Three of those defendants, Theresa Schettini, Josephine DiBiasi, and Frank DiBiasi, have pleaded guilty to the conspiracy count.

78. *See* Government Exhibits 12 and 13.

who "conduct, finance, manage, supervise, direct, or own all or part" of the illegal gambling enterprise. Defendants concede that the evidence establishes the participation of more than five persons in the business but they maintain that the participation of those other than the three defendants was not of the nature intended by Congress with the phrase "conducts, finances, manages, supervises, directs, or owns."

This issue was also resolved in United States v. Becker, *supra*. The defendants argued that the Government failed to prove the requisite participation on the part of five or more persons since most of the codefendants were mere "runners" or "agents" of the business. The court determined that lower echelon employees fell within the purview of the statutory term "conduct"; it stated:

"Admittedly the limits of the term 'conduct,' which embraces participation in the operation of an enterprise, are not defined in § 1955 itself. However, the legislative history of another, simultaneously-enacted section of the Organized Crime Control Act of 1970, 18 U.S.C. § 1511, sheds light on the intended meaning of the term. Section 1511, which prohibits conspiracy to obstruct the enforcement of the criminal laws of a state or one of its political subdivisions with the intent to facilitate an 'illegal gambling business,' defines the latter term in identical word-for-word terms as § 1955. With respect to the definition the authors of the bill stated

'The term "conduct" refers both to high level bosses and street level employees. It does not include the player in an illegal game of chance, nor the person who participates in an illegal gambling activity by placing a bet.' H.R.Rep.No.91–1549,

91st Cong., 2d Sess. (1970), 1970 U.S.Code Cong. & Adm.News p. 4029.

Thus Congress' intent was to include all those who participate in the *operation* of a gambling business, regardless how minor their roles and whether or not they be labelled agents, runners, independent contractors or the like, and to exclude only customers of the business.

Since §§ 1511 and 1955 were enacted together as Parts B and C (§§ 802–803) of Title VIII of the Organized Crime Control Act of 1970, P.L. 91–452, 84 Stat. 936–37 (1970), they should be construed *in pari materia*. The foregoing legislative history of the word 'conduct' as used in § 1511 is therefore of compelling persuasiveness in defining the meaning of the same term as used in § 1955. See 2 Sutherland, Statutory Construction § 5202 (1943). In view of the broad construction of 'conduct' by Congress, we find no difficulty in concluding that 'runners' or 'agents' of a bookmaker fall within this category and that the requirement that the business be conducted by a minimum of five (5) persons has been satisfied." (*id.* at 232–233).[79]

In light of this language, the defendants' argument must fail. The evidence conclusively establishes the requisite participation on the part of more than five persons, several of whom in fact appear to be involved in the management level of the enterprise.[80]

Defendants make no further arguments; nor have they offered this court any proposed findings of fact. It appears that their participation cannot be disputed in the offenses charged and they rely solely, to avoid conviction, on several legal arguments which this court has disposed of by this opinion. Thus,

79. *Cf.* Judge Weinfeld's jury charge in United States v. Becker, at 26–28 (December 6, 1971).

80. It should be noted that a number of codefendants have pleaded guilty to the offenses charged thereby admitting statutory participation in the gambling business the present defendants are charged with conducting. Three codefendants have pleaded guilty to the conspiracy count; twelve have peladed to the substantive count.

this court finds beyond a reasonable doubt, on the basis of the evidence produced by the Government and admitted before this court:

(1) with respect to Count 1 (Conspiracy): that each of the named defendants, Nicholas Mainello, Peter Candarini, and Joseph Candarini, from November 25, 1970, up to and including January 23, 1971, and thereafter, did unlawfully, wilfully and knowingly conspire with each other and other persons, within the Eastern District of New York, to violate federal law prohibiting illegal gambling businesses (18 U.S.C. § 1955); that each of the defendants knowingly associated himself with the conspiracy; that each of the defendants committed various overt acts in furtherance of the conspiracy; to wit, each of the defendants supervised and controlled the business of accepting gambling wagers and bets and each of them received gambling wagers and bets by telephone and in person at 2264 Bath Avenue, Brooklyn, New York, on a number of dates, including December 15, 1970; that each of the defendants had as an object of his conspiring the conduct and operation of a gambling business which was illegal under the laws of the State of New York; that each of the defendants intended and reasonably contemplated that the gambling business would involve at least five persons who would conduct, finance, manage, supervise and direct or own all or part of the gambling business; and that each of the defendants intended and reasonably contemplated that the illegal gambling business would substantially continue in operation for a period in excess of 30 days; and

(2) with respect to Count 2 (substantive offenses): that each of the defendants conducted a gambling business within the Eastern District of New York from November 25, 1970, up to and including January 23, 1971; that the gambling business was conducted in violation of the laws of the State of New York in that each of the defendants advanced gambling activity by unlawfully accepting bets from members of the public as a business, rather than in a casual, personal fashion, and in that each of the defendants knowingly advanced and profited from their gambling activity; that the gambling business was in operation in excess of 30 days; that more than 5 persons, including, but not only, Nicholas Sileo, Charles DeMarco, Joesph Taglianetti, Josie DiBiasi, and runners identified as "Freddie", "JA-5", and "JA-7", were involved with the defendants now before the court in the gambling operation in that they conducted, financed, managed, supervised, directed or owned the gambling business; and that each of the defendants did knowingly and wilfully conduct, finance, manage, supervise, direct and own the illegal gambling business.

Therefore, the court finds the defendants, Nicholas Mainello, Peter Candarini, and Joseph Candarini, guilty beyond a reasonable doubt on Counts One and Two of the Indictment.